# Exhibit A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| **LILLY MARTIN, JEAN TOURVILLE, JANE GOULD,** and **ALFREDO MENDOZA,** individually, and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. ) |
| **KCBX TERMINALS COMPANY,** a North Dakota corporation, **GEORGE J. BEEMSTERBOER, INC.,** an Indiana corporation, **KM RAILWAYS, LLC,** a Delaware limited liability company, **TRANSLOAD REALTY, LLC,** an Illinois limited liability company, **DTE CHICAGO FUELS TERMINAL, LLC,** a Michigan limited liability company, **CALUMET TRANSLOAD RAILROAD, LLC,** an Illinois limited liability company, and **KOCH CARBON, LLC,** a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) Jury Trial Demanded |

2013CH24614
CALENDAR/ROOM 16
TIME 00:00
Class Action

## CLASS ACTION COMPLAINT

Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually, and on behalf of all other persons and entities similarly situated ("Plaintiffs"), by and through counsel ZIMMERMAN LAW OFFICES, P.C., bring this Complaint against Defendants KCBX TERMINALS COMPANY ("KCBX"), KM RAILWAYS, LLC ("KMR"), GEORGE J. BEEMSTERBOER, INC. ("Beemsterboer"), TRANSLOAD REALTY, LLC ("Transload"), DTE CHICAGO FUELS TERMINAL, LLC ("DTE"), CALUMET TRANSLOAD RAILROAD, LLC ("Calumet Transload"), and KOCH CARBON,

LLC ("Koch Carbon") (collectively, "Defendants"), and hereby allege on information and belief as follows:

## Introduction

1.     This Complaint arises out of the presence of vast quantities of coal and petroleum coke, or "petcoke," a highly dangerous, hazardous contaminant, in the Chicago southeast side residential South Deering and East Side neighborhoods. These quantities of coal and petcoke are maintained in sprawling, uncovered piles up to five-stories high at three nearly adjacent storage and transfer terminals along the Calumet River currently or formerly owned, operated, controlled, and/or maintained by Defendants.

2.     Every day, winds hit Defendants' uncovered piles of coal and petcoke, and black clouds of coal and petcoke dust—called "fugitive dust"—are blown into the air and subsequently fall on homes, businesses, yards, streets, alleys, parkways, and other types of property neighboring Defendants' terminals. A photograph of one of these coal and petcoke dust clouds taken on August 30, 2013 is attached hereto as Exhibit A.

3.     Petcoke is a byproduct of the petroleum refining process. Petcoke contains concentrated amounts of sulfur, as well as the heavy metals nickel and vanadium, which is classified as a possible human carcinogen by the International Agency for Research on Cancer.

4.     According to the Material Safety Data Sheet ("MSDS") for petcoke, it can form combustible dust concentrations that may become flammable or explosive, and excessive exposure to petcoke dust may cause skin, eye or respiratory tract irritation. The MSDS recommends that individuals minimize physical contact with petcoke dust, do not breathe the dust, and avoid accumulation of the dust to prevent a fire hazard. (*See* MSDS for petcoke, attached hereto as Exhibit B).

5.    The petcoke MSDS warns that if petcoke dust is inhaled the person must be removed to fresh air, and repeated inhalation of petcoke dust may cause impaired lung function. (*See* Exhibit B). However, the Plaintiffs and Class members cannot escape the petcoke dust and access fresh air in their neighborhood, as the dust is constantly blowing in the air all throughout the neighborhood.

6.    Despite repeated complaints by affected residents, Defendants have refused and continue to refuse to take adequate measures to stop or mitigate the migration of hazardous coal and petcoke dust to the surrounding neighborhoods. The contamination of those neighborhoods is ongoing.

7.    As a result of the actions and inactions of Defendants, Plaintiffs and other South Deering and East Side neighborhood residents, former residents, and businesses have suffered property damage, have had their peace, quiet enjoyment, lives and futures uprooted and trampled, and have been deprived of the use of their homes, property and businesses.

8.    Accordingly, Plaintiffs seek compensation individually, and on behalf of a putative Class consisting of current and former residents and businesses whose property, and the use and enjoyment of their homes, property and businesses, have been and continue to be damaged as a result of the presence of hazardous coal and petcoke dust emanating from Defendants' terminals.

9.    Plaintiffs, individually, and on behalf of the putative Class, also seek injunctive relief to immediately stop the ongoing nuisance and trespass inflicted by Defendants, who continue to maintain vast quantities of hazardous petcoke and coal dust uncovered at or near the homes and businesses of Plaintiffs and the putative Class, and who refuse to take measures to stop this ongoing airborne contamination.

**The Plaintiffs**

10.     Plaintiff LILLY MARTIN is the owner of the property located at 10928 Mackinaw Avenue, in Chicago, which is in a neighborhood that has been and is being damaged by the migration of coal and petcoke dust as a result of Defendants' actions and inaction.  Ms. Martin has lived in this home for approximately 15 years.  While living in the home, Ms. Martin and her family have been exposed to the airborne coal and petcoke dust contamination of her home and property.

11.     Plaintiff JEAN TOURVILLE is the owner of the property located at 10933 Mackinaw Avenue, in Chicago, which is in a neighborhood that has been and is being damaged by the migration of coal and petcoke dust as a result of Defendants' actions and inaction.  While living in the home, Ms. Tourville and her family have been exposed to the airborne coal and petcoke dust contamination of her home and property.

12.     Plaintiff JANE GOULD is the owner of the property located at 10117 South Avenue M in Chicago, which is in a neighborhood that has been and is being damaged by the migration of coal and petcoke dust as a result of Defendants' actions and inaction.  While living in the home, Ms. Gould and her family have been exposed to the airborne coal and petcoke dust contamination of her home and property.

13.     Plaintiff ALFREDO MENDOZA is the owner of the property located at 3348 East 106th Street, in Chicago, which is in a neighborhood that has been and is being damaged by the migration of coal and petcoke dust as a result of Defendants' actions and inaction.  While living in his home, Mr. Mendoza and his family have been exposed to the airborne coal and petcoke dust contamination of his home and property.

14. At all times since moving into their homes, Plaintiffs reasonably expected that they and their families would have the full and unimpeded use and enjoyment of their homes and property.

15. Plaintiffs live in fear, apprehension, and great distress, and have been denied and will continue to be denied the full use and enjoyment of their homes and property as a result of the actions and inaction of Defendants in allowing the coal and petcoke dust to contaminate their homes and property.

16. Plaintiffs are putative Class Representatives who are similarly situated to residents and former residents of the southeast Chicago neighborhoods of South Deering and East Side, whose homes, businesses, property, lives, peace and quiet enjoyment have been damaged or impacted adversely by the presence of hazardous coal and petcoke dust contamination of their homes, property, and businesses caused by the Defendants.

### The Defendants

17. Defendant KCBX is a North Dakota corporation, located and doing business at 3259 East 100th Street, Chicago, Illinois. KCBX owns, operates, maintains, and/or controls a storage and transfer terminal at that location, situated on the western bank of the Calumet River ("100th Street Terminal"), and a storage transfer terminal located at 10730 South Burley Avenue, situated on the east bank of the Calumet River ("Burley Terminal"). KCBX stores large quantities of coal and petcoke at both of its terminals. KCBX is a subsidiary of Koch Industries, Inc.

18. Defendant KMR is a Delaware limited liability company who, upon information and belief, owns the property on which KCBX's Burley Terminal is situated, as well as rail

tracks and rail facilities on and adjacent thereto. KMR purchased this property from Defendant DTE in December, 2012. KMR is a subsidiary of Koch Industries, Inc.

19.     Defendant Beemsterboer is an Indiana limited liability company located and doing business at 2900 East 106th Street, in Chicago, Illinois. Beemsterboer owns, operates, maintains, and/or controls a storage and transfer terminal at that location, situated on the western bank of the Calumet River, on which large quantities of coal and petcoke are stored.

20.     Defendant Transload is an Illinois limited liability company that owns the property on which Beemsterboer operates its storage and transfer terminal.

21.     Defendant DTE is a Michigan limited liability company located at 414 South Main Street, in Ann Arbor, Michigan. Until December, 2012, DTE owned, operated, maintained, and/or controlled the Burley Terminal and the property on which the Burley Terminal is located.

22.     Defendant Calumet Transload is an Illinois limited liability company with its principal office located at the Burley Terminal. Until February 8, 2007, Calumet Transload owned, operated, maintained, and/or controlled the Burley Terminal and the property on which the Burley Terminal is located. Upon information and belief, Calumet Transload continues to operate, maintain, and/or control a storage and transfer terminal at that location, on which large quantities of coal and petcoke are stored.

23.     Defendant Koch Carbon is a Delaware limited liability company located and doing business at 106th Street and Calumet River, at or near 2900 East 106th Street, in Chicago, Illinois. On information and belief, Koch Carbon owns, operates, maintains, and/or controls a storage and transfer terminal at that location, situated on the western bank of the Calumet River, on which large quantities of coal and petcoke are stored.

## Jurisdiction and Venue

24.     Jurisdiction over Defendants is proper under 735 ILCS 5/2-209(a)(1) (transaction of any business within this State), section 2-209(a)(2) (the commission of a tortious act within this State), section 2-209(a)(3) (the ownership, use, or possession of any real estate situated in this State), section 2-209(b)(4) (corporation doing business within this State), and section 2-209(c) (any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States).

25.     Venue is proper in this County pursuant to 735 ILCS 5/2-101, because this is the County in which the transaction, or some part thereof occurred, and Defendants are corporations doing business in this County.  735 ILCS 5/2-102(a).

## Background

26.     Petcoke is a solid material and a byproduct of the oil refinery process, which upgrades fuel oil by heating it and cracking it to higher valued gasoline, jet, and diesel components.  Petcoke is over 90% carbon, and emits 5% – 10% more carbon dioxide than coal on a per-unit-of-energy basis when it is burned.

27.     Coal and petcoke dust is a form of particulate matter ("PM")—especially fine particles that contain microscopic solids or liquid droplets that are so small that they can get deep into the lungs and cause serious health problems. PM is linked to a variety of problems, including increased respiratory symptoms such as irritation of the airways, coughing, difficulty breathing, decreased lung function, aggravated asthma, and premature death in people with heart or lung disease.

28.     The petcoke affecting Plaintiffs and Class members is produced by the oil giant BP at its Whiting, Indiana refinery on Lake Michigan, just across the Indiana state line.  BP ships

much of its petcoke to Defendants' terminals in Chicago.

29.     The amount of petcoke stored at Defendants' terminals has skyrocketed recently. Indeed, the increase in the amount of petcoke produced by BP at its Whiting refinery prompted KCBX to expand its operations to the Burley Terminal last December. The half-mile square area has the capacity to hold hundreds of thousands of tons of petcoke.

30.     The amount of petcoke stored by Defendants in southeast Chicago is expected to continue to increase dramatically. BP is in the midst of a $3.8 billion upgrade to enable the company to refine more and heavier oils, primarily from the tar sands oil fields in Alberta, Canada.

31.     Upon completion of the upgrade, BP's new coker, which produces the petcoke, will be the second largest in the world. BP will produce more than 2.2 million tons of petcoke per year at its Whiting refinery, up from about 700,000 tons before the refinery was overhauled, to process oil from the tar sands region of Alberta. The drastic increase of production of petcoke at BP's Whiting refinery will result in a concomitant increase in the amount of petcoke stored at Defendants' terminals.

32.     For years, Plaintiffs and the Class members have noticed an infiltration of coal and petcoke dust in the air, and on their real and personal property. Several Plaintiffs and Class members have repeatedly complained about the contamination of their air and property to the Illinois Environmental Protection Agency, the U.S. Environmental Protection Agency, the City of Chicago, and other city, state, and federal agencies, as well as to Defendants.

33.     However, Defendants have refused and continue to refuse to take adequate corrective measures, such as covering or enclosing their piles of coal and petcoke, which would prevent dust from being carried off those piles and contaminating the real and personal property

of Plaintiffs and Class members.

34.     Other facilities that store petcoke have enclosed it.  For example, the piles of petcoke at the Port of Los Angeles were completely covered in 2002, due to the hazardous nature of the petcoke dust that was blowing off those piles into the community.  (*See* May 17, 2002 Los Angeles Times article, attached hereto as Exhibit C).  Furthermore, BP itself surrounds piles of petcoke that it produces at its Whiting facility with 40-foot walls before it ships the petcoke off of its premises.

35.     Instead of completely or partially enclosing their coal and petcoke piles, as other facilities have agreed to do, Defendants simply spray the piles of coal and petcoke with wet suppression equipment (*i.e.*, sprinklers spraying the piles with water and possibly a surfactant solution).

36.     Defendants' meager efforts to minimize the coal and petcoke dust emissions are insufficient to stop the migration of coal and petcoke dust into the air and property of Plaintiffs and the Class members.  Indeed, despite Defendants' spraying the coal and petcoke piles with water and/or surfactant, wind frequently hits these large piles and carries large quantities of dust from the piles into the surrounding neighborhoods.

37.     Moreover, upon information and belief, the Burley Terminal does not have a system for spraying all of the coal and petcoke piles at that terminal, and therefore, the emission of coal and petcoke dust from that location contaminates the surrounding neighborhoods unabated.

**The Illinois Environmental Protection Agency's Violation Notice**

38.     On October 24, 2013, the Illinois Environmental Protection Agency issued a violation notice ("Violation Notice") to Beemsterboer, alleging violations of environmental laws,

regulations, or permits. (*See* Violation Notice, attached hereto as Exhibit D). The Violation Notice further advised that, "[d]ue to the nature and seriousness of the alleged violations," Beemsterboer's violations may require the "involvement of a prosecutorial authority for purposes that may include, among others, the imposition of statutory penalties." (*See* Exhibit D, p.1).

39. According to the Violation Notice, Beemsterboer committed the following violations of the Illinois Environmental Protection Act, and the rules and regulations promulgated under the authority of that Act:

(a) Beemsterboer failed to obtain construction permits prior to the construction of a screener and modification to the materials handled at the facility by handling materials other than coal;

(b) Beemsterboer failed to obtain an operating permit prior to the operation of the screener and allowing the handling [of] material other than coal;

(c) Beemsterboer failed to develop, maintain, amend, and submit to the Illinois Environmental Protection Agency an operating program designed to significantly reduce fugitive particulate matter emissions;

(d) Beemsterboer failed to develop, maintain, and submit a PM-10 contingency measure plan to the Illinois Environmental Protection Agency;

(e) Beemsterboer failed to submit an Annual Emissions Report to the Illinois Environmental Protection Agency for calendar year 2012, and may have failed to submit complete, true, and accurate Annual Emission Reports for at least calendar years 2000 through 2011;

(f) Beemsterboer caused, threatened, or allowed the discharge of particulate matter into the atmosphere generated during material handling and storage operations causing or tending to cause air pollution.

(*See* Violation Notice, pp.3-4).

### The Effect of the Coal and Petcoke Dust on Plaintiffs and Class Members

40. Due to the coal and petcoke dust contamination of their property, Plaintiffs and Class members have been prevented from the full and unimpeded use and enjoyment of their homes and property. Additionally, Plaintiffs and Class members have suffered financial

damages as a result of the intrusion of coal and petcoke dust onto their property and homes, including the diminution of value of their homes and property.

41.     The emission and migration of coal and petcoke dust negatively affects residents' outdoor activities.  For example, on windy days, residents—many of whom are elderly and children—are forced to stay inside because of the danger and inconvenience posed by the coal and petcoke dust, as discussed above.

42.     Additionally, Plaintiffs and Class members cannot engage in outdoor activities such as swimming in their backyard swimming in pools, because the dust contaminates the water and attaches to the skin of those who swim in the contaminated water.  Nor can Plaintiffs and Class members enjoy barbeques and picnics, as the coal and petcoke dust gets into the food and beverages, which must be discarded.

43.     The coal and petcoke dust in the air eventually settles on the property of the Plaintiffs and Class members, leaving an unsightly and dangerous black coating on their property, such as the exterior of their homes, vehicles, lawn furniture, outdoor recreation equipment, pools, holiday decorations, and other possessions.

44.     The coal and petcoke dust infiltrates the interior of Plaintiffs' and Class members' homes as well, as it is drawn into their homes through windows, vents, chimneys, air conditioners, and doors, and is tracked in their homes through the entry of people and pets into the home.  Once inside the home, it accumulates on windows, drapes, carpet, upholstery, furniture, clothing, and walls, causing the Plaintiffs and Class members to have to spend money to clean and/or replace these items.

45.     Indeed, Plaintiffs and Class members are forced to keep their windows closed at all times to mitigate this danger and inconvenience, which deprives them of enjoyment of fresh

air and forces them to incur the expense of running air conditioners more often.

46. The coal and petcoke dust coating is dangerous to property, as it is highly flammable and explosive, and can be ignited by heat. (*See* petcoke MSDS, Exhibit B, pp. 1-5). Therefore, Plaintiffs and Class members must regularly spend time and money washing and rinsing the exterior and interior of their homes, furnishings, vehicles, and other real and personal property to prevent potentially catastrophic aggregation of coal and petcoke dust.

47. Plaintiffs and Class members must also frequently wash the ugly, black coal and petcoke dust off their homes, vehicles, and other property to maintain an acceptable aesthetic condition thereof, and to prevent their property from acquiring an unseemly smell as a result of the high sulfur content of petcoke dust.

48. Sometimes, the dust cannot be washed off or it leaves stains on the interior and exterior of Plaintiffs' and Class members' homes, and they are forced to frequently paint the inside and outside of their homes to hide the stains.

49. Not all of the property of Plaintiffs and Class members can be salvaged. Indeed, coal and petcoke dust ruins perishable items such as food and beverages, stains clothing, carpeting, upholstery and other furnishings, clogs air and water filters, and otherwise destroys or devalues Plaintiffs' and Class members' property. Therefore, Plaintiffs and Class members are required to replace these items more frequently than they otherwise would.

50. Moreover, some Plaintiffs and Class members are forced to alter the composition of their homes in order to mitigate the damage by removing carpeting, going without shades or drapes, and painting their homes a darker color.

51. Plaintiffs and Class members have expended and will expend in the future large sums of money for replacing, repairing, and/or remediating the damage to their property.

**Class Action Allegations**

52.     **Class Definition**: Plaintiffs bring this action pursuant to 735 ILCS 5/2-801 on

behalf of themselves and a Class of similarly situated individuals, defined as follows:

> **Subclass A**:    All persons and entities currently and formerly located in the South
> Deering and Elgin neighborhoods who have suffered property damage, and an
> interference with their use, peace and quiet enjoyment of their property, as a result
> of the migration of coal and petcoke dust onto or near their property.

> **Subclass B**:    All persons and entities in the South Deering and Elgin
> neighborhoods whose peace and quiet enjoyment is currently and will continue to
> be interfered with by the migration of coal and petcoke dust onto or near their
> property.

Excluded from the Class are: (1) Defendants, Defendants' agents, subsidiaries, parents,
successors, predecessors, and any entity in which Defendants or their parents have a controlling
interest, and those entities' current and former employees, officers, and directors; (2) the Judge
to whom this case is assigned and the Judge's immediate family; (3) any person who executes
and files a timely request for exclusion from the Class; (4) any person who has had their claims
in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives,
successors and assigns of any such excluded person.

53.     **Numerosity**: The exact number of Class members is unknown and is not

available to Plaintiffs at this time, but individual joinder in this case is impracticable, as the

putative Class includes thousands of people, businesses and property owners in the South

Deering and East Side neighborhoods whose homes, property and/or peace and quiet enjoyment

has been or may have been damaged by the presence or proximity of coal and petcoke dust.

54.     **Commonality**: The questions of fact or law common to the Class which

predominate over questions of law or fact unique to individual Class members are as follows:

> a.      Whether Plaintiffs and Class members' air, homes, and property have been
> contaminated by coal and petcoke dust;

> b.      Whether Defendants are responsible for the coal and petcoke dust
> contamination of Plaintiffs' and Class members' air, homes, and property;

c.  Whether Defendants have taken adequate steps to prevent coal and petcoke dust from contaminating Class members' air, homes, and property;

d.  Whether the presence of coal and petcoke dust on Plaintiffs' and Class members' homes and property has damaged Plaintiffs and Class members;

e.  Whether Defendants continue to own, operate, maintain, and/or control the coal and petcoke piles in such a manner that coal and petcoke dust continues to contaminate Plaintiffs' and Class members' air, homes, and property;

f.  Whether the operation, ownership and maintenance of Defendants' terminals have damaged Plaintiffs' and Class members' peace, quiet enjoyment and life routines, such that they should be compensated;

g.  Whether the Defendants' actions and inaction in owning, operating or maintaining their terminals constitute trespass;

h.  Whether the Defendants' actions and inaction in owning, operating or maintaining their terminals constitute nuisance;

i.  Whether the Defendants' actions and inaction in owning, operating or maintaining their terminals were negligent; and

j.  Whether the Court should enjoin the Defendants to ensure that coal and petcoke dust does not continue to contaminate Plaintiffs and Class members' air, homes, and property.

55.  **Predominance**: The common questions regarding facts, law and remedy predominate. The quantity and spatial distribution of the coal and petcoke dust contamination can be determined by common evidence and methodology. The fact that the measure of some damages may vary among the Class members does not lessen the propriety of maintaining this action as a class action. Due to the nature and mobility of the hazardous contamination caused or maintained in the South Deering and East Side neighborhoods, no individual damage can be determined except in conjunction with all other Class members.

56.  **Typicality**: The claims of the Plaintiffs are typical of the claims of the other members of the Class, as the representative Plaintiffs include persons who own or reside in

residential properties the South Deering and East Side neighborhoods and who have suffered and continue to suffer damages as a result of the coal and petcoke dust contamination caused by the Defendants.

57.     **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. All Class members will receive proper, efficient and appropriate protection of their interests by the Plaintiffs and their counsel.

58.     **Appropriateness**: A class action is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment of the claims of the class provides a method for the immediate adjudication of the claims herein and is superior to proceeding on an individual case by case adjudication which would increase dramatically the costs and time necessary to dispose of these claims, deny most Class members relief as a practical matter due to the costs and time required to prosecute these claims, and risk inconsistent and varying adjudications of these claims.

## COUNT I
### Private Nuisance
### (Against All Defendants)

59.     Plaintiffs repeat and re-allege paragraphs 1 to 58 as though fully set forth herein.

60.     Defendants' ownership, operation, control and/or maintenance of large, uncovered piles of coal and petcoke dust without adequate safeguards to prevent the dust from contaminating Plaintiffs' and Class members' homes, property, and businesses, was and is a continuous activity.

61. Defendants knew or had reason to know that their conduct would result in or was substantially certain to result in the invasion of Plaintiffs' and Class members' quiet use and enjoyment of their property, as well as a diminution in their property values.

62. Coal and petcoke dust contamination from the terminals owned, operated, controlled and/or maintained by the Defendants was and is present at, on, near and/or in Plaintiffs' and Class members' property and businesses, and the dust is physically offensive to the senses to the extent that it makes life uncomfortable for Plaintiffs and Class members.

63. Defendants have thereby invaded Plaintiffs' and Class members' interest in the quiet use and enjoyment of their property, and have caused a diminution in their property values.

64. This invasion of Plaintiffs' and Class members' quiet use and enjoyment of their properties is substantial, intentional or negligent, and unreasonable.

65. Plaintiffs and Class members have been and continue to be damaged by Defendants' acts and/or failure to act.

WHEREFORE, Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually, and on behalf of all other persons and entities similarly situated, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in 735 ILCS 5/2-801, *et seq.*, and certifying the Class defined herein;

B. Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiffs and the putative Class and against Defendants;

D. Awarding Plaintiffs and the Class compensatory damages, punitive damages, and reasonable attorney's fees and costs; and

E.     Granting all such further and other relief as the Court deems just and appropriate.

## COUNT II
### Trespass
### (Against All Defendants)

66.    Plaintiffs repeat and reallege paragraphs 1 to 65 as though fully set forth herein.

67.    Defendants' aforesaid actions and inaction in their ownership, operation, control and/or maintenance of their terminals has caused and is causing the migration of hazardous coal and petcoke dust onto and/or near the homes, property, and businesses of Plaintiffs and Class members.

68.    As a result of the actions and inaction of Defendants causing the migration of hazardous coal and petcoke dust onto and/or near the homes, property, and businesses of Plaintiffs and Class members, Plaintiffs and Class members have suffered damages, in that they are deprived of the exclusive possession and full use and enjoyment of their property due to the presence of the hazardous coal and petcoke dust contamination.

WHEREFORE, Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually, and on behalf of all other persons and entities similarly situated, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in 735 ILCS 5/2-801, *et seq.*, and certifying the Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Class and against Defendants;

D.     Awarding Plaintiffs and the Class compensatory damages, punitive damages, and reasonable attorney's fees and costs; and

17

E. Granting all such further and other relief as the Court deems just and appropriate.

## COUNT III
### Negligence
### (Against All Defendants)

69. Plaintiffs repeat and reallege paragraphs 1 to 68 as though fully set forth herein.

70. At all relevant times, Defendants had a reasonable duty of care to own, operate, control and/or maintain their terminals in such a way that hazardous coal and petcoke dust would not migrate onto and contaminate Plaintiffs' and Class members' property.

71. Defendants breached their duty by:

a. Failing to own, operate, maintain, and/or control their storage terminals and equipment in a manner that would prevent wind from blowing coal and petcoke dust from the piles of coal and petcoke stored at those terminals into the air and onto the homes, property and businesses of Plaintiffs and Class members;

b. Failing to take adequate measures to suppress the coal and petcoke dust so as to prevent the migration of coal and petcoke stored at Defendants' terminals into the air and onto the homes, property, and businesses of Plaintiffs and the putative Class;

c. Failing to maintain adequate coal and petcoke dust suppression systems at their terminals;

d. Failing to adequately contain or cover their piles of coal and petcoke so as to prevent coal and petcoke dust from migrating into the air and onto the homes, property and businesses of Plaintiffs and Class members;

e. Owning, operating, controlling, and/or maintaining their storage terminals and equipment in an unreasonable manner;

f. Failing to remediate the damage to the homes, property and businesses of Plaintiffs and Class members caused by coal and petcoke dust; and

g. Otherwise failing to own, operate, maintain and/or control their storage terminals in a reasonable manner so as to avoid damaging, diminishing the value of, and interfering with the Plaintiffs' and Class members' interest in the private use and enjoyment of their homes, businesses, and property.

72. It was foreseeable that if the Defendants did not own, operate, maintain and/or control their terminals in a manner that would prevent wind from blowing coal and petcoke dust off the piles of coal and petcoke stored at those terminals, Plaintiffs and Class members would suffer damage to their property. Indeed, the problem of "fugitive dust" is well-known within Defendants' industry.

73. As a direct and proximate result of Defendants' actions and failure to act, Plaintiffs and Class members have been damaged.

WHEREFORE, Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually and on behalf of all other persons and entities similarly situated, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in 735 ILCS 5/2-801, *et seq.,* and certifying the Class defined herein;

B. Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiffs and the Class and against Defendants;

D. Awarding Plaintiffs and the Class compensatory damages, punitive damages, and reasonable attorney's fees and costs; and

E. Granting all such further and other relief as the Court deems just and appropriate.

## COUNT IV
### Preliminary and Permanent Injunction
### (Against KCBX, KMR, Beemsterboer, and Transload)

74. Plaintiffs repeat and reallege paragraphs 1 to 73 as though fully set forth herein.

75. At all relevant times complained of herein, there existed in full force and effect certain statutes that permit for injunctions. *See* 735 ILCS 5/11-101 and 11-102.

76.     Plaintiffs seek an injunction to preserve the *status quo* and either (1) prevent Defendants from owning, maintaining, controlling, and/or operating their land and terminals in a manner that permits coal and petcoke dust to contaminate the air, homes, and other property of the Plaintiffs and Class members; or (2) require Defendants to abate the ongoing nuisance that they have created by covering and/or enclosing the large piles of coal and petcoke at Defendants' terminals.

77.     Defendants' actions and failure to act has caused and continues to cause Plaintiffs and Class members substantial damages in the form of financial damages, inconvenience, loss of use and enjoyment of their property, and diminution of their property values. Plaintiffs and Class members have no other means to put a stop to the contamination of their property.

78.     Plaintiffs are likely to succeed on the merits. Plaintiffs have a right to the uninterrupted use and enjoyment of their property, and to be free from invasion thereupon by hazardous coal and petcoke dust. Defendants have no valid, legal basis for invading Plaintiffs' and Class members' property, or intruding upon their use and enjoyment thereof.

79.     Plaintiffs and Class members have a clearly ascertainable right to the uninhibited use and enjoyment of their property.

80.     Plaintiffs lack any complete and adequate remedy at law, as Defendants' actions are continuous and ongoing in nature, and Defendants have refused Plaintiffs' and Class members repeated pleas to Defendants to halt or substantially reduce their offending conduct.

81.     Enforcement is feasible, as other terminals and facilities that store coal and petcoke have enclosed and/or covered their piles of coal and petcoke, as described above. Furthermore, the coal and petcoke piles described herein are adjacent to large piles of road salt, which are covered, demonstrating that covering these large piles is possible.

82.     It would be easy to ascertain whether Defendants continue to engage in this misconduct, as relevant authorities such as the Illinois Environmental Protection Agency can monitor the air, and monitor compliance through inspections.

83.     Plaintiffs and Class members will be irreparably injured absent immediate injunctive relief. Defendants' misconduct is intentional, continuous, and ongoing, as the piles of coal and petcoke remain uncovered and the dust remains insufficiently suppressed.

84.     The balancing of the hardships favors the issuance of an injunction here. Defendants operate facilities that handle hazardous coal and petroleum coke in a densely-populated part of the city of Chicago—one of the largest metropolitan areas in the country. It is indisputable that the activities in which Defendants engage result in the migration of coal and petcoke dust onto Plaintiffs' and Class members' property, and pose a health risk to them. Defendants can feasibly and without undue hardship take steps to reduce the migration of coal and petcoke dust by enclosing and/or covering the coal and petcoke, as other facilities have done.

85.     There are no excuses for Defendants' unlawful actions.

WHEREFORE, Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually and on behalf of all other persons and entities similarly situated, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in 735 ILCS 5/2-801, *et seq.,* and certifying the Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Class and against Defendants;

D.   Enjoining Defendants to either:

    (1)   stop owning, maintaining, controlling, and/or operating their land and terminals in a manner that permits coal and petcoke dust to contaminate the air, homes, and other property of the Plaintiffs and Class members; or

    (2)   abate the ongoing nuisance that they have created by covering and/or enclosing the large piles of coal and petcoke at Defendants' terminals;

E.   Awarding Plaintiffs and the Class compensatory damages, punitive damages, and reasonable attorney's fees and costs; and

F.   Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Plaintiffs LILLY MARTIN, JEAN TOURVILLE, JANE GOULD, and ALFREDO MENDOZA, individually, and on behalf of all others similarly situated,

By: _____

Thomas A. Zimmerman, Jr.
Adam M. Tamburelli
Frank J. Stretz
ZIMMERMAN LAW OFFICES, P.C.
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
Firm I.D. No. 34418
www.attorneyzim.com

Counsel for Plaintiffs and the Class



Exhibit A

# Safety Data Sheet
# Petroleum Coke

**NFPA:**

Flammability

Health / Reactivity

**1**
**0** / **0**

Specific Hazard


TESORO

## SECTION 1. PRODUCT AND COMPANY IDENTIFICATION

| | | |
|---|---|---|
| **Product name** | : | Petroleum Coke |
| **Synonyms** | : | Green Coke, Uncalcined Coke, Thermocracked Coke, Fuel Grade Coke, 888100004472 |
| **SDS Number** | : | 888100004472    **Version**    :    1.20 |
| **Product Use Description** | : | Fuel |
| **Company** | : | For: Tesoro Refining & Marketing Co. 19100 Ridgewood Parkway, San Antonio, TX 78259 |
| **Tesoro Call Center** | : | (877) 783-7676    **Chemtrec (Emergency Contact)**    :    (800) 424-9300 |

## SECTION 2. HAZARDS IDENTIFICATION

| | | |
|---|---|---|
| **Classifications** | : | Combustible Dust |
| **Pictograms** | | None |
| **Signal Word** | | WARNING |
| **Hazard Statements** | | May form combustible dust concentrations in air. Excessive exposure may cause skin, eye or respiratory tract irritation. |

**Precautionary Statements**

**Prevention**

Avoid accumulations of finely ground dust.
Keep away from flames and hot surfaces. No smoking.
Wear gloves, eye protection and face protection as needed to prevent skin and eye contact with liquid.
Wash hands or liquid-contacted skin thoroughly after handling.
Do not eat, drink or smoke when using this product.
Do not breathe dust.
Use only outdoors or in a well-ventilated area.

**Response**

In case of fire: Use dry chemical, $CO_2$, water spray or fire fighting foam to extinguish.
If on skin (or hair): Rinse skin with water or shower. Remove and wash contaminated clothing.
If in eye: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing.
If inhaled: Remove person to fresh air and keep comfortable for breathing.

| SAFETY DATA SHEET | Petroleum Coke | Page 2 of 7 |
|---|---|---|

| | Immediately call or doctor or emergency medical provider. If skin, eye or respiratory system irritation persists, get medical attention. |
|---|---|
| **Storage** | Avoid generating heavy concentrations of airborne, finely-ground petroleum coke dust. Avoid accumulations of finely ground dust on surfaces of equipment or buildings. |
| Disposal | Dispose of contents/containers to approved disposal site in accordance with local, regional, or national regulations. |

## SECTION 3. COMPOSITION/INFORMATION ON INGREDIENTS

| Component | CAS-No. | Weight % |
|---|---|---|
| Coke (Petroleum) | 64741-79-3 | 100% |

## SECTION 4. FIRST AID MEASURES

| Inhalation | : | If inhaled, remove to fresh air. If not breathing, give artificial respiration. If necessary, provide additional oxygen once breathing is restored if trained to do so. Seek medical attention immediately. |
|---|---|---|
| **Skin contact** | : | Take off all contaminated clothing immediately. Wash off with soap and plenty of water. Wash contaminated clothing before re-use. Seek medical advice if symptoms persist or develop. |
| **Eye contact** | : | Remove contact lenses. Immediately flush eyes thoroughly with warm water for at least 15 minutes. Hold the eyelids open and away from the eyeballs to ensure that all surfaces are flushed thoroughly. Seek medical advice. |
| **Ingestion** | : | Ingestion is considered unlikely. However, inhalation procedures should be followed if this happens. Drink 1 or 2 glasses of water. Do NOT induce vomiting. Never give anything by mouth to an unconscious person. Obtain medical attention. |
| **Notes to physician** | : | Symptoms: Vomiting, Diarrhea, Pain |

## SECTION 5. FIRE-FIGHTING MEASURES

| Suitable extinguishing media | : | Water spray, Dry chemical, Foam, Carbon dioxide blanket, A solid stream of water may scatter and spread the fire. |
|---|---|---|
| **Specific hazards during fire fighting** | : | Product will burn. In very large quantities, spontaneous heating and combustion may occur. Fire will produce dense black smoke containing hazardous combustion products (see Section 10). |
| **Special protective equipment for fire-fighters** | : | Firefighting activities that may result in potential exposure to high heat, smoke or toxic by-products of combustion should require NIOSH/MSHA- approved pressure-demand self-contained breathing apparatus with full facepiece and full protective clothing. |
| Further information | : | Large fires are best extinguished with water. Surfactant (foam or soap) in water may be effective in reaching deep, smoldering fires (such as in coke pile). |

## SECTION 6. ACCIDENTAL RELEASE MEASURES

SAFETY DATA SHEET — Petroleum Coke — Page

**Personal precautions** : ACTIVATE FACILITY'S SPILL CONTINGENCY OR EMERGENCY RESPONSE PLAN if applicable. Ventilate the area. Evacuate personnel to safe areas.

**Environmental precautions** : Prevent further leakage or spillage. Should not be released into the environment. Do not allow material to contaminate ground water system. In case of accident or road spill notify CHEMTREC (800) 424-9300. U.S. Coast Guard regulations require immediate reporting of spills that could reach any waterway including intermittent dry creeks. Report spill to Coast Guard toll free number (800) 424-8802.

**Methods for cleaning up** : Carefully vacuum, shovel, scoop or sweep up into a waste container for reclamation or disposal. Water fog may be necessary to minimize dust generation. Respiratory protection is recommended where visible dust may be generated.

## SECTION 7. HANDLING AND STORAGE

**Precautions for safe handling** : Minimize physical contact with the product. Avoid conditions which create dust. Do not breathe vapors or dust. Avoid dispersal of coke dust into air such as cleaning dusty surfaces with compressed air.

: Keep away from heat and sources of ignition. No smoking near areas where material is stored or used. Ground and bond containers during product transfers to reduce the possibility of static-initiated fire or explosion.

**Dust explosion class** : High concentrations of airborne petroleum coke dusts may be ignited by contact with heated surface. Airborne coke dust is primarily a fire hazard, but explosion may be possible.

**Conditions for safe storage, including incompatibilities** : Avoid generation and accumulation of dust when handling this material. Refer to NFPA 654 Standard for Prevention of Fire & Dust Explosions.

: Stable under recommended storage conditions.

## SECTION 8. EXPOSURE CONTROLS / PERSONAL PROTECTION

### Exposure Guidelines

| List | Components | CAS-No. | Type: | Value |
|------|-----------|---------|-------|-------|
| OSHA | Petroleum Coke | 64741-79-3 | TWA | 15mg/m3 (total dust) 5 mg/m3 (respirable dust) |
| ACGIH | Petroleum Coke | 64741-79-3 | TL | 10 mg/m3 (total dust) 3 mg/m3 (respirable dust) |
| OSHA | Coal Tar Pitch Volatiles Benzene Soluble Fraction | 65996-93-2 | TWA | 0.2 mg/m3 |
| ACGIH | Coal Tar Pitch Volatiles Benzene Soluble Fraction | 65996-93-2 | TLV | 0.2 mg/m3 |

NOTE: Limits shown for guidance only. Follow applicable regulations.

**Engineering measures** : Use adequate ventilation to keep dust concentrations of this product below occupational exposure limits. Facilities storing or utilizing this material should be equipped with an eyewash facility and a safety shower. Dust control equipment such as local exhaust ventilation or material transport systems handling coke should contain explosion relief vents or explosion suppression systems.

| SAFETY DATA SHEET | Petroleum Coke | |

| | | |
|---|---|---|
| Eye protection | : | Indirect vented, dust-tight goggles are recommended if dust is generated when handling this product. |
| Hand protection | : | Work gloves are recommended if needed to prevent repeated or prolonged skin contact. |
| Skin and body protection | : | Disposable clothing such as Tyvek® (DuPont) may be warranted to minimize skin and clothing contamination, depending on the work to be performed. Flame resistant clothing such as Nomex ® is recommended in areas where material is stored or handled. |
| Respiratory protection | : | A NIOSH/ MSHA-approved air-purifying respirator with particulate classification N-95 or greater filter cartridges or canister may be permissible under certain circumstances where airborne concentrations are or may be expected to exceed exposure limits or for odor or irritation. Protection provided by air-purifying respirators is limited. Refer to OSHA 29 CFR 1910.134, ANSI Z88.2-1992, NIQSH Respirator Decision Logic, and the manufacturer for additional guidance on respiratory protection selection. Use a NIOSH/ MSHA-approved positive-pressure supplied-air respirator if there is a potential for uncontrolled release, exposure levels are not known, in oxygen-deficient atmospheres, or any other circumstance where an air-purifying respirator may not provide adequate protection. |
| Hygiene measures | : | Use good personal hygiene practices. Avoid repeated and/or prolonged skin exposure. Wash hands before eating, drinking, smoking, or using toilet facilities. When using do not eat, drink or smoke. Promptly remove contaminated clothing and launder before reuse. |

## SECTION 9. PHYSICAL AND CHEMICAL PROPERTIES

| | |
|---|---|
| Appearance | Dark brown to black solid |
| Odor | Asphalt – like odor |
| Odor threshold | Not determined |
| pH | Not determined |
| Melting point/freezing point | Not determined |
| Initial boiling point | Not determined |
| Flash point | Not determined |
| Evaporation rate | Not determined |
| Flammability (solid, gas) | Solid |
| Upper flammable limit | Not determined |
| Lower flammable limit | 15 to 1000 g/m³ |
| Vapor Pressure | Not applicable |
| Vapor density (air = 1) | No data available |
| Relative density (water = 1) | >1.0 |
| Solubility (in water) | Insoluble |
| Partition coefficient (n-octanol/water) | No data available |

| SAFETY DATA SHEET | Petroleum Coke | Page 5 of 7 |
|---|---|---|

| Auto-ignition temperature | 670°C (1,238°F) |
|---|---|
| Kinematic viscosity | No data available |
| Kst | 47 to 74 bar m/s |
| MIE | > 1000 mj |

## SECTION 10. STABILITY AND REACTIVITY

| Reactivity | : | Airborne dust may become flammable or explosive. |
|---|---|---|
| Chemical stability | | Stable under normal conditions. |
| Possibility of hazardous reactions | | Keep away from oxidizing agents, and acidic or alkaline products. |
| Conditions to avoid | | Avoid accumulation of finely ground dust. Minimize generation of airborne dust. See Section 7 for additional information. |
| Hazardous decomposition products | | In case of fire, hazardous decomposition products may be produced such as carbon monoxide, carbon dioxide, hydrocarbons and smoke. No decomposition if stored and applied as directed. |

## SECTION 11. TOXICOLOGICAL INFORMATION

| Inhalation | Inhalation of excessive dust concentrations may be irritating to the upper respiratory system. Repeated chronic inhalation exposure may cause impaired lung function. There is no evidence that such exposures cause pneumoconiosis, carcinogenicity, or other chronic health effects. |
|---|---|
| Ingestion | Low order of oral toxicity. Ingestion is considered unlikely. However, good personal hygiene such as washing hands and face after handling or contacting material before eating, drinking or smoking should be practiced to minimize ingestion of this product. |
| Skin contact | Contact may cause skin irritation. |
| Eye contact | May cause irritation, experienced as mild discomfort and seen as slight excess redness of the eye. |
| Further information | Repeated inhalation of the petroleum coke dust (10.2 and 30.7 mg/m3) over a two-year period resulted in lung damage typical of high dust exposure including inflammation and scarring in rats. Similar exposures in monkeys did not produce similar lung effects. There was no observation of a carcinogenic effect at any dose following a lifetime exposure. There is no evidence of pneumoconiosis or carcinogenicity in human health studies. 24 months of exposure in monkeys and rats to either 10.2 or 30.7 mg/m3 of coke dust resulted in lung accumulation of dust. There was no associated tissue abnormality in monkeys. A low level inflammatory response developed in the rat lung at 10.2 mg/m3 and more significant inflammatory changes occurred in the rat lung at 30.7 mg/m3. There was no evidence of carcinogenicity in either species. Mouse skin painting bioassay negative. |
| Acute oral toxicity | LD50 rat<br>Dose: > 2,000 mg/kg<br>The toxicological data has been taken from products of similar composition. |
| Acute dermal toxicity | LD50 rabbit<br>Dose: > 2.000 mg/kg<br>The toxicological data has been taken from products of similar composition. |

| SAFETY DATA SHEET | Petroleum Coke | Page 6 |
|---|---|---|

| Acute inhalation toxicity | No data available |
|---|---|

**Carcinogenicity**

| NTP | No component of this product which is present at levels greater than or equal to 0.1 % is identified as a known or anticipated carcinogen by NTP. |
|---|---|
| IARC | No component of this product which is present at levels greater than or equal to 0.1 % is identified as probable, possible or confirmed human carcinogen by IARC. |
| OSHA | No component of this product which is present at levels greater than or equal to 0.1 % is identified as a carcinogen or potential carcinogen by OSHA. |
| CA Prop 65 | This product does not contain any chemicals known to State of California to cause cancer, birth, or any other reproductive defects. |

## SECTION 12. ECOLOGICAL INFORMATION

| Additional ecological information | : | Keep out of sewers, drainage areas, and waterways. Report spills and releases, as applicable, under Federal and State regulations. |
|---|---|---|

## SECTION 13. DISPOSAL CONSIDERATIONS

| Disposal | : | Dispose of container and unused contents in accordance with federal, state and local requirements. |
|---|---|---|
| | | Product is suitable for burning for fuel value in compliance with applicable laws and regulations. |
| | | RCRA: The unused product, in our opinion, is not specifically listed by the EPA as a hazardous waste (40 CFR, Part 261D), nor is it formulated to contain materials which are listed hazardous wastes. It does not exhibit the hazardous characteristics of ignitability, corrosivity, or reactivity. The unused product is not formulated with substances covered by the Toxicity Characteristic Leaching Procedure (TCLP). However, used product may be regulated. |

## SECTION 14. TRANSPORT INFORMATION

| CFR | : | Not regulated by USA DOT 49 CFR. |
|---|---|---|
| ICAO/IATA | : | Not regulated by ICAO/IATA. |

## SECTION 15. REGULATORY INFORMATION

U.S. FEDERAL, STATE AND LOCAL REGULATORY INFORMATION

Any spill or uncontrolled release of this product, including any substantial threat of release, may be subject to federal, state and/local reporting requirements. This product and/or its constituents may also be subject to other regulations at the state and/or local level. Consult those regulations applicable to your facilty/operation.

| TSCA Status | : | On TSCA Inventory |
|---|---|---|
| DSL Status | : | All components of this product are on the Canadian DSL list. |
| SARA 311/312 Hazards | : | No SARA Hazards |

**SAFETY DATA SHEET**      **Petroleum Coke**

**CERCLA SECTION 103 and SARA SECTION 304 (RELEASE TO THE ENVIROMENT)**
The CERCLA definition of hazardous substances contains a "petroleum exclusion" clause which exempts crude oil. Fractions of crude oil, and products (both finished and intermediate) from the crude oil refining process and any indigenous components of such from the CERCLA Section 103 reporting requirements. However, other federal reporting requirements, including SARA Section 304, as well as the Clean Water Act may still apply.

PENN RTK      US. Pennsylvania Worker and Community Right-to-Know Law (34 Pa. Code Chap. 301-323)

**Components**      CAS-No.

**Coke (Petroleum)**      64741-79-3

NJ RTK      US. New Jersey Worker and Community Right-to-Know Act (New Jersey Statute Annotated Section 34:5A-5)

**Components**      CAS-No.

**Coke (Petroleum)**      64741-79-3

California Prop. 65     :   This product may contain detectable quantities of chemicals known to the State of California to cause cancer, birth defects or other reproductive harm, and which may be subject to the requirements of California Proposition 65.

| | | |
|---|---|---|
| Nickel / Nickel Compounds | Cancer | 7440-02-0 |
| Chromium, Hexavalent Compounds | Cancer | 18540-29-9 |
| Lead | Cancer | 7439-92-1 |
| Lead | Developmental | 7439-92-1 |
| Polycyclic Aromatic Hydrocarbons including: | | |
| Benzo(a)pyrene | Cancer | 50-32-8 |
| Indeno(1,2,3-cd)pyrene | Cancer | 193-39-5 |

## SECTION 16. OTHER INFORMATION

Further information

The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.

10/29/2012

163, 275, 1142

← Back to Original Article

Los Angeles

# Port of L.A. Covers Its Petroleum Coke

*Health: The facility is storing the potentially carcinogenic material in a $7.5-million barn.*

May 17, 2002 | SANDRA MURILLO | TIMES STAFF WRITER

After years of public outcry, lawsuits and environmental studies, politicians and officials at the Port of Los Angeles announced Thursday that all petroleum coke piles at the port have been covered.

Assemblyman Alan Lowenthal (D-Long Beach) and representatives of the South Coast Air Quality Management District and the Los Angeles Export Terminal held a news conference Thursday to announce the completion of an enormous storage barn on Terminal Island that will house the potentially carcinogenic petroleum coke piles.

The piles are now covered by the $7.5-million storage barn, which is 105 feet tall and 240 feet wide. The barn was built by the export terminal, which handles about half of the 5 million tons of coke shipped out of the ports of Los Angeles and Long Beach every year.

Petroleum coke, a coal-like byproduct of the oil refining process, is exported to Asia for use as an industrial fuel. If inhaled in sufficient quantities, the material can cause cancer, officials said.

"They'd put it in these huge piles ... and it would blow on the community," Lowenthal said. When he first got elected to the Long Beach City Council in 1992, residents near the port complained to him about the dust on their windows and boats, he said.

Studies have shown a link between elevated levels of coke dust in the air and the deaths of people with respiratory illness and heart disease. An early study in Long Beach showed that coke dust comprised 12% to 15% of air pollutants.

"We ship out some of the worst stuff in the world," Lowenthal said.

Officials at the Los Angeles Export Terminal had argued that installing roofs over the coke piles would be too costly, and they said that dust was being controlled by sprinklers and other devices.

In 1998, the terminal began building two $20-million concrete domes covering 75,000 tons of coke each, said Jim Holland, vice president of operations.

Subsequent regulations by the AQMD mandated full enclosure of the coke piles awaiting shipment that, at that point, were not covered.

The new rules required equipment and procedural changes by January 2004 to facilities and trucks that handle petroleum coke. A bill introduced by Lowenthal and signed by Gov. Gray Davis two years ago advanced the deadline to next month.

The Los Angeles Export Terminal "has always wanted to work with the community," said Gerald Swan, the terminal's president. "We are committed to a clean environment, and I hope that the vast sums of money we have spent will render that very end."

The Port of Long Beach has until Jan. 1, 2004, to cover parts of its antiquated loading machinery.

Exhibit C

Web2PDF
converted by Web2PDFConvert.com



# ILLINOIS ENVIRONMENTAL PROTECTION AGENCY

1021 NORTH GRAND AVENUE EAST, P.O. BOX 19276, SPRINGFIELD, ILLINOIS 62794-9276 • (217) 782-2829
PAT QUINN, GOVERNOR                    LISA BONNETT, DIRECTOR

TDD 217/782-9143

OCT 24 2013

Certified Mail # 7009 3410 0002 3750 1787
Return Receipt Requested

Peter Smith
Beemsterboer Slag Corp.
2900 E. 106th Street
Chicago, Illinois 60617

RE:    Violation Notice A-2013-00235
       I.D. 031600FES

Dear Mr. Smith:

This constitutes a Violation Notice pursuant to Section 31(a)(1) of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/31(a)(1), and is based upon a review of available information and an investigation by representatives of the Illinois Environmental Protection Agency ("Illinois EPA").

The Illinois EPA hereby provides notice of alleged violations of environmental laws, regulations, or permits as set forth in Attachment A to this letter. Attachment A includes an explanation of the activities that the Illinois EPA believes may resolve the specified alleged violations, including an estimate of a reasonable time period to complete the necessary activities. Due to the nature and seriousness of the alleged violations, please be advised that resolution of the violations may also require the involvement of a prosecutorial authority for purposes that may include, among others, the imposition of statutory penalties.

A written response, which may include a request for a meeting with representatives of the Illinois EPA, must be submitted via certified mail to the Illinois EPA within 45 days of receipt of this letter. If a meeting is requested, it shall be held within 60 days of receipt of this notice. The response must include information in rebuttal, explanation, or justification of each alleged violation and a statement indicating whether or not the source wishes to enter into a Compliance Commitment Agreement ("CCA") pursuant to Section 31(a) of the Act. If the source wishes to enter into a CCA, the written response must also include proposed terms for the CCA that contains dates for achieving each commitment and may also include a statement that compliance has been achieved for some or all of the alleged violations. In order to increase the likelihood of the Illinois EPA accepting such terms, the written response should specifically propose them in a manner that can be formalized into an enforceable agreement between the Illinois EPA and the source. As such, proposed conditions should be as detailed as possible, including steps to be taken to achieve compliance, the manner of compliance, interim and completion dates, etc.

Page 2
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

The Illinois EPA will review the proposed terms for a CCA provided by the source and, within 30 days of receipt, will respond with either a proposed CCA or a notice that no CCA will be issued by the Illinois EPA. If the Illinois EPA sends a proposed CCA, the source must respond in writing by either agreeing to and signing the proposed CCA or by notifying the Illinois EPA that the source rejects the terms of the proposed CCA.

If a timely written response to this Violation Notice is not provided, it shall be considered a waiver of the opportunity to respond and meet, and the Illinois EPA may proceed with referral to the prosecutorial authority.

Written communications should be directed to JOHN REKESIUS, Illinois EPA, Bureau of Air, Compliance Unit, P.O. Box 19276, Springfield, Illinois 62794-9276. All communications must include reference to the Violation Notice number in this matter.

Questions regarding this matter should be directed to JOSEPH KOTAS at 847/294-4023.

Sincerely,

*Raymond E. Pilapil /EEJ*

Raymond E. Pilapil, Manager
Compliance Section
Bureau of Air

REP: jr

Page 3
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

## ATTACHMENT A

Per observations by Joseph Kotas on September 6, 11, and 13, 2013, and other available information:

VIOLATIONS:

1. Section 9(b) of the Act and 35 Ill. Adm. Code 201.142: Beemsterboer Slag Corp. failed to obtain construction permits prior to the construction of a screener and modification to the materials handled at the facility by handling materials other than coal.

2. Section 9(b) of the Act and 35 Ill. Adm. Code 201.143: Beemsterboer Slag Corp. failed to obtain an operating permit prior to the operation of the screener and allowing the handling any material other than coal.

3. Section 9.12 of the Act: Beemsterboer Slag Corp. failed to pay applicable construction permit application fees.

4. Section 9(a) of the Act and 35 Ill. Adm. Code 212.309, 212.310, and 212.312: Beemsterboer Slag Corp. failed to develop, maintain, amend, and submit to the Illinois EPA, an operating program designed to significantly reduce fugitive particulate matter emissions.

5. Section 9(a) of the Act and 35 Ill. Adm. Code 212.316(g)(1) and (g)(5): Beemsterboer Slag Corp. failed to submit annual and quarterly reports for activities involving fugitive particulate matter control measures.

6. Section 9(a) of the Act and 35 Ill. Adm. Code 212.316 (g)(2) and (g)(4): Beemsterboer Slag Corp. may have failed to document and maintain the records required by 35 Ill. Adm. Code 212.316(g)(2).

7. Section 9(a) of the Act and 35 Ill. Adm. Code 212.701: Beemsterboer Slag Corp. failed to develop, maintain, and submit a PM-10 contingency measure plan to the Illinois EPA.

8. Section 9(a) of the Act and 35 Ill. Adm. Code 201.302(a) and 254.132(a): Beemsterboer Slag Corp. failed to submit an Annual Emissions Report ("AER") to the Illinois EPA for calendar year 2012. Specifically this AER was due May 1, 2013. In addition, Beemsterboer Slag Corp. may have failed to submit complete, true, and accurate AERs for at least calendar years 2000 through 2011.

Page 4
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

## ATTACHMENT A (Continued)

9. Section 9.1(d) of the Act and 40 CFR 63.6595, 63.6600, 63.6603, 63.6605, 63.6612, 63.6615, 63.6620, 63.6625, 63.6640, 63.6645, 63.6650, 63.6655, 63.6660, 63.6665: Beemsterboer Slag Corp. may have failed to comply with the emission limitation standards; the corresponding operation, maintenance, and monitoring plan requirements; the testing and initial compliance requirements; the monitoring requirements; and the notification, reporting, and record keeping requirements of 40 CFR 63, Subpart ZZZZ – National Emission Standards for Hazardous Air Pollutants for Reciprocating Internal Combustion Engines ("Subpart ZZZZ") and NESHAP Subpart A- General Provisions as indentified in Table 8 of Subpart ZZZZ.

10. Section 9(a) of the Act and 35 Ill. Adm. Code 201.141: Beemsterboer Slag Corp. caused, threatened, or allowed the discharge of particulate matter into the atmosphere generated during material handling and storage operations causing or tending to cause air pollution.

RECOMMENDATIONS:

The Illinois EPA suggests that Beemsterboer Slag Corp. take the following actions to address the violations stated above:

1. Immediately cease causing or tending air pollution from the material handling and storage operations.

2. Within 45 days of receipt of this Violation Notice, develop, implement, and submit a compliance plan, along with dates of implementation, which will ensure the prevention of air pollution from the facility that cause, threaten, or allows the unreasonable interference with the enjoyment of life and property of local citizens. This compliance plan should include at a minimum any and all interim and/or permanent measures and procedures that will be undertaken.

3. Within 45 days of receipt of this Violation Notice, submit to the Illinois EPA a complete, true, accurate, and acceptable operating permit application for all current emission units and all materials that will be handled at this facility.

4. Within 45 days of receipt of this Violation Notice, submit to the Illinois EPA, Bureau of Air, Compliance Section, the applicable avoided construction fees. Note the construction fee form can be found at: http://www.epa.state.il.us/air/permits/construction-fees.html

Page 5
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

## **ATTACHMENT A (Continued)**

RECOMMENDATIONS (Continued):

5. Within 45 days of receipt of this Violation Notice, develop, implement, maintain, and submit to the Illinois EPA, Bureau of Air, Compliance Section a complete, true, accurate, and acceptable operating program in accordance with 35 Ill. Adm. Code 212.309 and 212.310.

6. Within 45 days of receipt of this Violation Notice, develop, implement, and submit to the Illinois EPA internal policy to ensure that the operating program is documented, maintained, and amended, as specified in 35 Ill. Adm. Code 212.309, 212.310, and 212.312.

7. Within 45 days of receipt of this Violation Notice, develop, implement, and submit to the Illinois EPA, Bureau of Air, Compliance Section an internal policy to ensure the documentation of the records of fugitive emission control measures required by 35 Ill. Adm. Code 212.316(g)(2) and these records are maintained and readily accessible upon inspection in accordance with 35 Ill. Adm. Code 212.316(g)(4).

8. Within 45 days of receipt of this Violation Notice, submit to the Illinois EPA, Bureau of Air, Compliance Section, fugitive particulate matter control measures reports covering calendar years 2008, 2009, 2010, 2011, and 2012. Specifically, these reports will list the dates that fugitive particulate matter control measures were and were not implemented, a listing of those control measures implemented, the reasons that the control measures were not implemented, and any other corrective actions taken.

9. Within 45 days of receipt of this Violation Notice, develop, implement, and submit to the Illinois EPA, Bureau of Air, Compliance Section, an internal policy that will ensure the quarterly fugitive particulate matter control measures reports, required by 35 Ill. Adm. Code 212.316(g)(5) are submitted to the Illinois EPA within 30 calendar days from the end of a quarter (Quarters end March 31, June 30, September 30, and December 31).

10. Within 45 days of receipt of this Violation Notice, develop, implement, and submit to the Illinois EPA, an internal policy to ensure the annual report containing the written records of the application of control measures, as may be needed for compliance with opacity limitations, will be prepared and submitted timely.

11. Within 45 days of receipt of this Violation Notice, submit a PM-10 Contingency Measure Plan to the Illinois EPA, Compliance Section, in accordance with 35 Ill. Adm. Code 212.701 and 212.703.

Page 6
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

## ATTACHMENT A (Continued)

RECOMMENDATIONS (Continued):

12. Within 45 days of receipt of this Violation Notice, develop, implement, and submit to the Illinois EPA, an internal policy to ensure the Contingency Measures Plan is documented, maintained, implemented, and amended as specified in 35 Ill. Adm. Code 212.701, 212.702, 212.703, and 212.704.

13. Within 45 days of the receipt of this Violation Notice, submit the following information to the Illinois EPA, Bureau of Air, Compliance Section, date of construction, date of initial operation, and the monthly and 12-month rolling annual emissions of nitrogen oxides ("NO$_x$"), carbon monoxide ("CO"), particulate matter ("PM"), particulate matter less than 10 microns ("PM$_{10}$"), sulfur dioxide ("SO$_2$"), volatile organic materials ("VOM"), and hazardous air pollutants ("HAPs") for calendar years 2000 through 2012 for each emission source, along with supporting documentation.

14. Within 45 days of receipt of this Violation Notice, submit a complete, true, and accurate AER for calendar years 2000 through 2012 to the Illinois EPA, Bureau of Air, Compliance Section.

15. Within 45 days of receipt of this Violation Notice, develop, implement, and submit an internal policy that will ensure AERs will be complete, true, accurate, and timely submitted to the Illinois EPA, Bureau of Air, Compliance Section.

16. Within 45 days of receipt of this Violation Notice, submit to the Illinois EPA a detailed explanation identifying how and when compliance with Subpart ZZZZ regulations cited above will be achieved.

    a. Testing shall be conducted, documented, and reported by an independent testing service in accordance with appropriate USEPA Methods and an approvable stack test protocol. Two copies of the proposed test protocol shall be submitted to the Division of Air Pollution Control/Compliance Section and one copy shall be submitted to the Division of Air Pollution Control/Field Operation Section ("FOS") at least 60 days prior to the scheduled test date. The test protocol must comply with the applicable requirements of 40 CFR 63.7(c) and the test methods and procedures specified in 40 CFR 63.7(d) and 40 CFR 63.6620 for diesel engine.

    b. In order to enable the Illinois EPA to witness the test, the Compliance Section and FOS shall be notified in writing of the test date at least 60 days before the expected testing date. Final confirmation of the exact date and time of the test shall be made at least five (5) days prior to the test date.

Page 7
Violation Notice A-2013-00235
Beemsterboer Slag Corp., I.D. 031600FES

## ATTACHMENT A (Continued)

RECOMMENDATIONS (Continued):

    c.  Testing shall be conducted under conditions representative of maximum process operating rates and prior to making any modifications to the existing source equipment, control equipment and stacks.

    d.  The final report for the test(s) shall be submitted to the Compliance Section (two copies) and FOS (one copy) within 60 days of completion of testing.

    e.  The reports and notification described above should be submitted to:

Illinois EPA/Bureau of Air
Field Operation Section
Attn: Regional Manager
9511 Harrison Street
Des Plaines, IL 60016
(1 copy)

Illinois EPA/Bureau of Air
Compliance Section
Attn: Kevin Mattison
9511 Harrison Street
Des Plaines, IL 60016
(1 copy)

Illinois EPA/Bureau of Air
Compliance Section (MC40)
Attn: Raymond Pilapil
1021 North Grand Avenue East
P.O. Box 19276
Springfield, IL 62794-9276
(1 copy)