**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ROSALIO CAMPOS, RAYMOND FIGUEROA, | ) | |
| PATRICIA A. FISHER, SUSAN SADLOWSKI | ) | Case No. 1:13-cv-08376 |
| GARZA, JANE GOULD, LILLY MARTIN, | ) | |
| ALFREDO MENDOZA, KEVIN P. MURPHY, | ) | Consolidated with: |
| JOANN PODKUL, and JEAN TOURVILLE, | ) | |
| individually and on behalf of all other persons | ) | |
| and entities similarly situated, | ) | Case No. 1:13-cv-08499 |
| | ) | Case No. 1:13-cv-09038 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | The Honorable Manish S. Shah |
| BP PRODUCTS NORTH AMERICA, INC., | ) | |
| CALUMET TRANSLOAD RAILROAD, LLC, | ) | |
| DTE CHICAGO FUELS TERMINAL, LLC, | ) | |
| GEORGE J. BEEMSTERBOER, INC., | ) | |
| BEEMSTERBOER SLAG AND BALLAST | ) | |
| CORPORATION, KCBX TERMINALS | ) | |
| COMPANY, KM RAILWAYS, LLC, and | ) | |
| KOCH CARBON, LLC, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ..................................................................................................................... 6

I.    Standard of Review ................................................................................................. 6

II.    Plaintiffs' Private Nuisance Claim Is Well Pleaded ............................................. 7

      A.    Storage/Distribution Defendants Are on Notice of the Nature of Plaintiffs'
          Nuisance Claim ......................................................................................... 8

      B.    Plaintiffs' Private Nuisance Claim Against BP Is Well Pleaded ............. 11

III.    Plaintiffs' Trespass Claim Is Well Pleaded ....................................................... 13

IV.    Plaintiffs' Negligence Claim Is Well Pleaded .................................................... 15

      A.    The CAC Pleads That Storage/Distribution Defendants Own, Operate,
          Maintain, and/or Control the Storage Facilities and Petcoke ................. 16

      B.    Storage/Distribution Defendants Had a Duty to Act with Reasonable Care
          and Breached that Duty ............................................................................ 16

      C.    It Was Foreseeable that the Uncovered Storage and Distribution
          of Petcoke and Coal Dust at the Storage Facilities Would
          Result in Harm to Plaintiffs .................................................................... 19

      D.    Plaintiffs Were Damaged as a Result of Storage/Distribution
          Defendants' Breaches .............................................................................. 19

V.    Plaintiffs' Abnormally Dangerous Activity Claim Is Well Pleaded ................... 20

      A.    The Activity Is Not a Matter of Common Usage, Was Highly Inappropriate
          and Unsafe Where Carried Out, and the Dangers of the Activity Far Outweigh
          Any Negligible Value to the Community ................................................. 21

      B.    It Was Highly Likely, if Not Certain, that the Activity Would Result
          in Significant Harm ................................................................................. 21

      C.    It Would be Extremely Difficult to Eliminate the Risks Posed by the Activity ...... 22

      D.    BP Mischaracterizes Plaintiffs' Abnormally Dangerous Activity Claim ............... 25

i

VI.     Plaintiffs State a Claim for Strict Liability in Tort ............................................................ 26

    A.     The CAC Pleads All of the Elements for Strict Liability Based
       on Product Defect ......................................................................................................26

    B.     Strict Liability is Applicable to Landowner Defendants as Lessees ........................31

VII.    Plaintiffs State a Claim for Willful and Wanton Misconduct ...........................................32

VIII.   Plaintiffs' Civil Conspiracy Claim Is Well Pleaded .........................................................35

IX.     Plaintiffs' Declaratory Relief Claim Is Well Pleaded ........................................................36

    A.     Alleged Duplicity Is an Insufficient Basis to Dismiss Plaintiffs' Declaratory
       Relief Claim .............................................................................................................37

    B.     Beemsterboer Defendants' Arguments Directed at the Scope of the
       Declaratory Relief Claim Are in Error ....................................................................41

CONCLUSION ...............................................................................................................................43

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abrams v. City of Chicago*,
    811 N.E.2d 670 (Ill. 2004) ..................................................................................28

*Adcock v. Brakegate, Ltd.*,
    645 N.E.2d 888 (Ill. 1994) ..................................................................................36

*Amundsen v. Chi. Park Dist.*,
    218 F.3d 712 (7th Cir. 2000) ..............................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................................6

*Balanyi v. Local 1031, Int'l Bd. of Elec. Workers AFL-CIO*,
    374 F.2d 723 (7th Cir. 1967) ..............................................................................37

*Barton v. Chi. and Nw. Transp. Co.*,
    757 N.E.2d 533 (Ill. App. Ct. 2001) ...................................................................33

*Bear v. Power Air, Inc.*,
    595 N.E.2d 77 (Ill. App. Ct. 1992) .....................................................................32

*Beahringer v. Page*,
    789 N.E.2d 1216 (Ill. 2003) ...........................................................................39, 40

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................8, 15

*Belmar Drive–In Theatre Co. v. Ill. State Toll Highway Comm'n*,
    216 N.E.2d 788 (Ill. 1966)....................................................................................7

*Benson v. Unilever U.S., Inc.*,
    884 F. Supp. 2d 708 (S.D. Ill. 2012) ..................................................................32

*Burke v. 12 Rothschild's Liquor Mart, Inc.*,
    593 N.E.2d 522 (Ill. 1992) ..................................................................................33

*Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*,
    135 F.3d 526 (7th Cir. 1998) ..............................................................................13

*Carter v. New Trier E. High Sch.*,
    650 N.E.2d 657 (Ill. App. Ct. 1995) ...................................................................34

*Chi. Title Land Trust Co. v. JS II, LLC,*
  977 N.E.2d 198 (Ill. App. Ct. 2012) ........................................................................33

*Chicago-Virden Coal Co. v. Wilson,*
  67 Ill. App. 443 (1896) ...............................................................................................14

*City of Chicago v. Beretta U.S.A. Corp.,*
  821 N.E.2d 1099 (Ill. 2004) ...................................................................................11, 12

*City of Chicago v. Am. Cyanamid Co.,*
  823 N.E.2d 126 (Ill. App. Ct. 2005) .........................................................................12

*City of Evanston v. Texaco, Inc.,*
  No. 13 C 2106, 2014 WL 683736 (N.D. Ill. Feb. 21, 2014)........................................33

*Classic Bus. Corp. v. Equilon Enter., LLC,*
  No. 09 C 7735, 2011 WL 290431 (N.D. Ill. Jan. 27, 2011) .................................40, 41

*Cmty . Programs of Westchester of Jewish Cmty. Servs. v. City of Mt. Vernon,*
  No. 06 Civ. 3332, 2007 WL 2981915 (S.D.N.Y. Oct. 9, 2007) ...........................38, 39

*Consumer Protection Corp. v. Neo-Tech News,*
  No. 08-cv-1983, 2009 WL 2132694 (D. Ariz. July 16, 2009)......................................38

*Crowe v. Public Bldg. Comm.,*
  383 N.E.2d 951 (Ill. 1978) .........................................................................................32

*Davis v. Romney,*
  490 F.2d 1360 (3d Cir. 1974) .....................................................................................37

*Dial v. City of O'Fallon,*
  411 N.E.2d 217 (Ill. 1980) .........................................................................................13

*Drakeford v. Univ. of Chi. Hosps.,*
  994 N.E.2d 119 (Ill. App. Ct. 2013) .........................................................................34

*Engel v. Buchan,*
  710 F.3d 698 (7th Cir. 2013) .......................................................................................6

*Facio v. Jones,*
  929 F.2d 541 (10th Cir. 1991) ...................................................................................38

*Fed. Deposit Ins. Corp. v. Amy,*
  No. 13 C 5888, 2014 WL 1018136 (N.D. Ill. Mar. 13, 2014) .............................15, 18

*Fleisher v. Fiber Composites, LLC*,
  No. CIV.A. 12-1326, 2012 WL 5381381 (E.D. Pa. Nov. 2, 2012) ...........................................38

*Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*,
  No. 2:12-CV-02441 ES, 2013 WL 2177974 (D.N.J. May 20, 2013) ........................................37

*Fritz v. Johnston*,
  807 N.E.2d 461 (Ill. 2004) .....................................................................................................35

*Gen. Ins. Co. of Am. v. Clark Mall, Corp.*,
  No. 08 C 2787, 2010 WL 3765352 (N.D. Ill. Sept. 16, 2010)...........................................41, 42

*Illinois Farmers Ins. Co. v. Sunbeam Prods., Inc.*,
  No. 10-CV-713-JPG-DGW, 2013 WL 1192388 (S.D. Ill. Mar. 22, 2013) ..............................29

*In re Auto. Parts Antitrust Litig.*,
  No. 12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013)..........................................39

*In re Chi. Flood Litig.*,
  680 N.E.2d 265 (Ill. 1997) ........................................................................................... *passim*

*In re Chi. Flood Litig.*,
  No. 93 C 1214, 1993 WL 239041 (N.D. Ill. June 28, 1993) ...................................................25

*In re Hardieplank Fiber Cement Siding Litig.*,
  No. 12-MD-2359, 2013 WL 3717743 (D. Minn. July 15, 2013).............................................38

*Ind. Harbor Belt R. Co. v. Am. Cyanamid Co.*,
  916 F.2d 1174 (7th Cir. 1990) ................................................................................................24

*Instant Tech., LLC v. DeFazio*,
  No. 12 C 491, 2014 WL 1759184 (N.D. Ill. May 2, 2014) ......................................................36

*Irshad Learning Ctr. v. Cnty. of DuPage*,
  804 F. Supp. 2d 697 (N.D. Ill. 2011) ......................................................................................38

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*,
  973 N.E.2d 880 (Ill. 2012) .....................................................................................................34

*Lane v. DuPage Cnty. Sch. Dist. 45*,
  No. 13-cv-5386, 2014 WL 518445 (N.D. Ill. Feb. 10. 2014) ..................................................34

*Lewis v. Bank of Am. NA*,
  No. CV 13-7717, 2013 WL 7118066 (C.D. Cal. Dec. 18, 2013) .............................................39

*Loufrani v. Wal-Mart Stores, Inc.*,
 No. 09 C 3062, 2009 WL 3787941 (N.D. Ill. Nov. 12, 2009)...............................................42, 43

*McCauley v. City of Chicago*,
 671 F.3d 611 (7th Cir. 2011) ..................................................................................................6, 7

*McCoy v. Iberdrola Renewables Inc.*,
 No. 11 C 592, 2013 WL 4027045 (N.D. Ill. Aug. 7, 2013) ........................................................34

*Mikolajczyk v. Ford Motor Co.*,
 901 N.E.2d 329 (Ill. 2008)........................................................................................................27

*Miller v. Civil Constructors*,
 651 N.E.2d 239 (Ill. App. Ct. 1995) ........................................................................................28

*Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*,
 668 N.E.2d 223 (Ill. App. Ct. 1996) ........................................................................................13

*Murphy v. Mancari's Chrysler Plymouth, Inc*,
 887 N.E.2d 569 (Ill. App. Ct. 2008) ........................................................................................29

*Murray v. Chi. Youth Ctr.*,
 864 N.E.2d 176 (Ill. 2007) ........................................................................................................33

*Navarro v. Neal*,
 716 F.3d 425 (7th Cir. 2013) .....................................................................................................6

*Nelson v. Union Wire Rope Corp.*,
 199 N.E.2d 769 (Ill. 1964) ........................................................................................................17

*Patterson v. Peabody Coal Co.*,
 122 N.E.2d 48 (Ill. App. Ct. 1954) ..........................................................................................8, 9

*Pella Corp. v. Saltzman*,
 606 F. 33 391 (7th Cir. 2010) ....................................................................................................39

*Poole v. City of Rolling Meadows*,
 656 N.E.2d 768 (Ill. 1995) ........................................................................................................33

*Prier v. Steed*,
 456 F.3d 1209 (10th Cir. 2006) .................................................................................................37

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*,
 344 U.S. 237 (1952)............................................................................................................37, 42

*Rivera v. Lake Cnty.*,
    974 F. Supp. 2d 1179 (N.D. Ill. 2013) ....................................................................30

*S & A Futures, LLC--Series 2 v. Sysco Chi., Inc.*,
    No. 11 C 7629, 2012 WL 851556 (N.D. Ill. Mar. 13, 2012) ....................................40

*Saltzman v. Pella Corp.*,
    No. 06-cv-4481, 2007 WL 844883 (N.D. Ill. Mar. 20, 2007) ...................................38

*Schneiderman v. Interstate Transit Lines, Inc.*,
    69 N.E.2d 293 (Ill. 1946) .........................................................................................33

*Shephard v. U.S. Olympic Comm.*,
    94 F. Supp. 2d 1136 (D. Colo. 2000) .......................................................................38

*Sparks v. Starks*,
    856 N.E.2d 575 (Ill. App. Ct. 2006) ........................................................................33

*Suvada v. White Motor Co.*,
    210 N.E.2d 182 (Ill. 1965) .......................................................................................31

*Tamco Corp. v. Fed. Ins. Co. of New York*,
    216 F. Supp. 767 (N.D. Ill. 1963) ...........................................................................36

*Tornabene v. Paramedic Servs. of Ill., Inc.*,
    731 N.E.2d 965 (Ill. App. Ct. 2000) ........................................................................34

*Trans States Airlines v. Pratt & Whitney Can., Inc.*,
    682 N.E.2d 45 (Ill. 1997) .........................................................................................26

*Village of DePue v. Viacom Int'l, Inc.*,
    632 F. Supp. 2d 854 (C.D. Ill. 2009) .......................................................................13

*Vulcan Golf, LLC v. Google Inc.*,
    552 F. Supp. 2d 752 (N.D. Ill. 2008) ..................................................................40, 41

*Walker Process Equip., Inc. v. FMC Corp.*,
    356 F.2d 449 (7th Cir. 1966) ...................................................................................37

*Wheat v. Freeman Coal Mining Corp.*,
    319 N.E.2d 290 (Ill. App. Ct. 1974) ..........................................................................9

*White v. Jeffrey Galion, Inc.*,
    326 F. Supp. 751 (E.D. Ill. 1971).............................................................................31

*Winters v. Winters*,
   78 Ill. App. 417 (1898) ................................................................................9, 14, 15

*Wyss v. Compact Indus.*,
   No. 13 C 05135, 2014 WL 960846 (N.D. Ill. Mar. 12, 2014) ......................................6

*Ziarko v. Soo Line R.R. Co.*,
   641 N.E.2d 402 (Ill. 1994) ........................................................................................33

Federal Statutes and Rules

28 U.S.C. § 2201 .........................................................................................................37

Fed. R. Civ. P. 8(d) .....................................................................................................38

Fed. R. Civ. P 12(b)(6) ............................................................................................6, 15

Fed. R. Civ. P. 12(e) ...................................................................................................30

Fed. R. Civ. P. 23(b)(2) ..............................................................................................39

Miscellaneous Authorities

Restatement (Second) of Torts § 402A (1965) ............................................................28

Restatement (Second) of Torts § 520 (1977) .................................................21, 22, 23

Restatement (Second) of Torts § 821D (1979) .............................................................7

Restatement (Second) of Torts § 834 (1979) .........................................................11, 12

W. Keeton, Prosser & Keeton on Torts § 78 (5th ed. 1984) ........................................20

Charles E. Cantu, *Distinguishing the Concept of Strict Liability for Ultra-Hazardous Activities
From Strict Products Liability Under Section 402A of the Restatement (Second) of Torts:
Two Parallel Lines of Reasoning That Should Never Meet*, 35:1 Akron L. Rev. 31 (2001) .........28

David G. Owen, *Design Defect Ghosts*, 74:3 Brooklyn L. Rev. 927 (2009) ................................28

Plaintiffs submit this omnibus response in opposition to Defendant DTE Chicago Fuels Terminal LLC's ("DTE") Motion to Dismiss [D.E. #79]; Defendants Beemsterboer Slag and Ballast Corporation, George J. Beemsterboer, Inc., and Calumet Transload Railroad LLC's (collectively, "Beemsterboer Defendants") Partial Motion to Dismiss [D.E. #73]; Defendants KCBX Terminals Company ("KCBX"), Koch Carbon, LLC, and KM Railways LLC's ("KMR") (collectively, KCBX Defendants") Motion to Dismiss [D.E. #76]; and Defendant BP Products North America Inc.'s ("BP") Motion to Dismiss [D.E. #82].

## INTRODUCTION

Since October 31, 2008, petroleum coke ("petcoke") and coal dust emanating from three industrial storage facilities located at 3259 East 100th Street, Chicago, Illinois (the "100th Street Terminal"); 10730 South Burley Avenue, Chicago, Illinois (the "Burley Terminal"); and 2900 East 106th Street, Chicago, Illinois (the "106th Street Terminal") (collectively, the "Storage Facilities"), has contaminated and polluted Plaintiffs' homes, yards, other properties, and the neighborhoods in which they live. The contamination and pollution has caused significant public outcry, this litigation, and separate legal proceedings brought by the Illinois Environmental Protection Agency and the Illinois Attorney General.

Plaintiffs' Consolidated Class Action Complaint ("CAC") alleges that Defendants failed to take reasonable and adequate measures to prevent petcoke and coal dust—highly dangerous and hazardous substances—from contaminating and polluting the communities surrounding the Storage Facilities. The CAC further alleges that as a result of Defendants' failures, petcoke and coal dust have blown throughout Plaintiffs' neighborhoods, contaminating the air, coating the homes, yards, schools, parks, and other property within affected areas, reducing the value of property located within the affected areas, and interfering with Plaintiffs' reasonable use and enjoyment of their homes and other property.

1

As detailed herein, Plaintiffs' claims are well pleaded. The CAC states claims against Defendants for private nuisance, trespass, negligence, abnormally dangerous activity, strict liability in tort, willful and wanton misconduct, civil conspiracy, and declaratory relief. Defendants' arguments to the contrary misstate the applicable pleading standards, misconstrue Plaintiffs' allegations and Illinois substantive law, and wrongly attempt to convince the Court that this straightforward matter is exceedingly complex.

Respectfully, Defendants' motions to dismiss the CAC should be denied.

## STATEMENT OF FACTS

Petcoke is a black powdery byproduct of the crude oil refining process. CAC ¶ 27. Similar to coal dust, petcoke is dust-like, flammable, and highly susceptible to being transported by wind and inhaled. *Id.* ¶ 29. Petcoke is principally used as fuel in power plants to generate electricity, to create aluminum and steel, and to make cement. *Id.* ¶ 28. The burning of petcoke is even dirtier than the burning of coal. *Id.* ¶ 30. As a result of this fact and U.S. environmental regulations, most petcoke produced by U.S. refineries is exported to countries with less stringent environmental regulations. *Id.* ¶¶ 31–32.

Since 2010, the production of petcoke in the U.S. has increased dramatically. *Id.* ¶ 33. In 2010, U.S. refineries exported 20 million barrels of petcoke. *Id.* In 2012—just two years later—U.S. refineries exported over 184 million barrels of petcoke. *Id.* The increase is attributable to U.S. refineries processing increased amounts of heavy oil extracted from the Canadian oil sands and the amounts are expected to continue to increase in the near future. *Id.* ¶¶ 33, 36.

BP's Whiting Refinery's production of petcoke has increased significantly during the past few years. *Id.* ¶¶ 37–38. As part of a $4 billion renovation project, the largest coker in North America was recently installed at the Whiting Refinery. *Id.* The new coker enables the Whiting

Refinery to produce up to 2,200,000 tons of petcoke per year, which is triple the refinery's petcoke production capacity prior to the expansion. *Id.* ¶¶ 37–40.

BP takes steps at the Whiting Refinery to prevent petcoke from blowing into, contaminating, and polluting communities surrounding the refinery. *Id.* ¶¶ 39, 41. Petcoke stored at the Whiting Refinery is surrounded by 40-foot walls. *Id.* When transferring petcoke, the Whiting Refinery uses an enclosed conveyor and loading system equipped with wind screens and water sprayers to minimize emissions. *Id.*

After approximately five days at the Whiting Refinery, petcoke is transported to the Storage Facilities. *Id.* ¶ 42. The Storage Facilities are located in an area regularly subject to moderate to high winds, within the midst of densely populated neighborhoods, and in close proximity to a number of schools, churches, and parks. *Id.* ¶ 43. In stark contrast to the Whiting Refinery, where measures are employed to prevent the migration of petcoke into surrounding communities, petcoke and coal dust was and continues to be stored at the Storage Facilities outside in huge uncovered piles. *Id.* ¶ 44. At times, the piles of petcoke and coal dust have reached as high as five stories tall. *Id.* Petcoke and coal dust originating at the Storage Facilities has been blown throughout, contaminated, and polluted surrounding communities.

Defendants KCBX, KMR, DTE, Calumet Transload, Beemsterboer, and Beemsterboer Slag (collectively, the "Storage/Distribution Defendants") owned, operated, and/or controlled one or more of the Storage Facilities during the relevant time period or the land on which a Storage Terminal is located. *Id.* ¶¶ 17, 19–23. KCBX—a subsidiary of Koch Industries, Inc.— owned, operated and controlled the 100th Street Terminal, and Beemsterboer and Beemsterboer Slag ("Beemsterboer Defendants") owned, operated, and controlled the 106th Street Terminal. *Id.* ¶¶ 17, 20–21. Additionally, since December 2012, KCBX has owned, operated, and/or

controlled the Burley Terminal, and its sister company KMR—also a subsidiary of Koch Industries, Inc.—has owned the property on which the Burley Terminal is located and the rail tracks and rail facilities on and adjacent thereto. *Id.* ¶¶ 17, 19. From February 2007 to December 2012, DTE owned, operated, and/or controlled the Burley Terminal and the property on which it is located. *Id.* ¶¶ 22–23. Calumet Transload owned, operated, maintained, and/or controlled the Burley Terminal and the property on which the Burley Terminal is located until February 8, 2007, and continues to operate, maintain, and control a storage and transfer terminal at that location, on which large quantities of petcoke and coal dust are stored. *Id.* ¶ 23. Koch Carbon owned and controlled a substantial amount of petcoke and coal dust that is stored and transferred at the Storage Facilities. *Id.* ¶ 24.

Communities surrounding the Storage Facilities suffered significant damages as a result of petcoke and coal dust emanating from the Storage Facilities. Plaintiffs reside within these communities and were each damaged by petcoke and coal dust from the Storage Facilities. *Id.* ¶¶ 5–14. Plaintiffs' homes, yards, and neighborhoods have been contaminated and polluted by petcoke and coal dust originating at the Storage Facilities. *Id.* As a result, the value of Plaintiffs' homes have been reduced, they have been forced to spend time and effort cleaning the petcoke and coal dust from their homes and yards, and the air in and around their residences has been polluted with petcoke and coal dust. *Id.*

The emission and migration of petcoke and coal dust from the Storage Facilities has negatively affected Plaintiffs' ability to engage in and reasonably enjoy outdoor activities. *Id.* For example, on windy days, Plaintiffs have sometimes been forced to stay inside because of the danger and inconvenience posed by petcoke and coal dust contaminated air. *Id.* ¶ 49. Petcoke and coal dust from the Storage Facilities have settled on Plaintiffs' and Class members' property,

including their homes, vehicles, lawn furniture, outdoor recreation equipment, pools, holiday decorations, and other possessions, leaving an unsightly and dangerous black coating. *Id.* ¶ 50. Petcoke and coal dust from the Storage Facilities have also infiltrated the interior of Plaintiffs' and Class members' homes through windows, vents, chimneys, air conditioners, and doors, and has been tracked in their homes through the entry of people and pets. *Id.* ¶ 51. Plaintiffs and Class members have, at times, kept their windows closed to prevent petcoke and coal dust from invading their homes, depriving them of the reasonable full use and enjoyment of their homes, and requiring them to incur the expense of running air conditioners and replacing air filters more often than they otherwise would. *Id.*

The expenditure of time and money washing and rinsing the exterior and interior of homes, furnishings, vehicles, and other real and personal property has been required to prevent potentially hazardous aggregations of petcoke. *Id.* ¶ 52. Plaintiffs and Class members have been required to wash the unsightly black petcoke and coal dust off their homes, vehicles, and other property to maintain an acceptable aesthetic condition and prevent their property from acquiring an unseemly smell as a result of the high sulfur content of petcoke emanating from the Storage Facilities. *Id.* ¶ 53. Sometimes, the petcoke and coal dust emanating from the Storage Facilities cannot be washed off of Plaintiffs' and Class members' property, leaving stains on Plaintiffs' and Class members' property. *Id.* ¶ 54.

Not all of the property of Plaintiffs and Class members can be salvaged. *Id.* ¶ 55. Indeed, petcoke and coal dust emanating from the Storage Facilities ruins perishable items such as food and beverages, stains clothing, carpeting, upholstery and other furnishings, clogs air and water filters, and otherwise destroys or devalues Plaintiffs' and Class members' property. *Id.* Therefore, Plaintiffs and Class members are required to replace these items more frequently than

they otherwise would. *Id.* Plaintiffs and Class members have expended and, unless protected from petcoke and coal dust emanating from the Storage Facilities in the future, will expend in the future large sums of money for replacing, repairing, and/or remediating the damage to their property. *Id.* ¶ 56.

## ARGUMENT

### I. Standard of Review

"To survive a [Rule 12(b)(6)] motion, a complaint taken as a whole must set forth enough factual detail to give the defendant fair notice of the claims and the grounds upon which they rest, and the factual allegations in the complaint must add up to a claim for relief that is plausible on its face." *Wyss v. Compact Indus.*, No. 13 C 05135, 2014 WL 960846, at *1 (N.D. Ill. Mar. 12, 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. v. Twombly,* 550 U.S. 544, 555–57, 570 (2007); *Engel v. Buchan*, 710 F.3d 698, 709 (7th Cir. 2013)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility requirement is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In reviewing a motion to dismiss, courts accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Navarro v. Neal,* 716 F.3d 425, 429 (7th Cir. 2013). "Determining whether a complaint states a plausible claim is a 'context-specific' task that requires courts to draw on their 'experience and common sense.'" *Wyss*, 2014 WL 960846, at *1 (quoting *Iqbal*, 556 U.S. at 679).

Plaintiffs' allegations are not subject to a heightened pleading standard as KCBX Defendants contend. Quoting *McCauley v. City of Chi.*, 671 F.3d 611 (7th Cir. 2011), KCBX Defendants assert that "in more complex cases like the instant one, '[t]he required level of

6

factual specificity rises with the complexity of the claim,' in that 'more detail' will be required to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected.'" *See* KCBX Memo. p. 8. *McCauley* involved a "complicated and counterintuitive" equal protection claim. 671 F.3d at 619. In contrast, Plaintiffs allege straightforward claims for nuisance, trespass, negligence, abnormally dangerous activity, strict liability in tort, civil conspiracy, willful and wanton misconduct, and declaratory judgment. Thus, Plaintiffs' claims are not subject to heightened pleading requirements and KCBX Defendants' reliance on *McCauley* is misguided. As set forth below, Defendants—including KCBX Defendants—are on notice of what Plaintiffs' claims entail and the claims are plausible.

## II.    Plaintiffs' Private Nuisance Claim Is Well Pleaded

The CAC's allegations of airborne petcoke and coal dust particles accumulating in and around Plaintiffs' homes describe a classic private nuisance. "A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land. The invasion must be: substantial, either intentional or negligent, and unreasonable." *In re Chi. Flood Litig.*, 680 N.E.2d 265, 277 (Ill. 1997). "The standard for determining if particular conduct constitutes a nuisance is the conduct's effect on a reasonable person." *Id.* (citing *Belmar Drive–In Theatre Co. v. Ill. State Toll Highway Comm'n*, 216 N.E.2d 788, 791 (Ill. 1966)). Unlike trespass, which "is an invasion of the interest in the exclusive possession of land, as by entry upon it [,] . . . [a] nuisance is an interference with the interest in the private use and enjoyment of the land, and *does not* require interference with the possession.'" *Chi. Flood Litig.*, 680 N.E.2d at 277 (quoting Restatement (Second) of Torts § 821D cmt. d (1979)) (emphasis added) (alteration in original). Defendants' efforts to parse the pleading here fail.

### A. Storage/Distribution Defendants Are on Notice of the Nature of Plaintiffs' Nuisance Claim

The amount of additional factual allegations demanded by Storage/Distribution Defendants borders on the ridiculous in the context of a Rule 12(b)(6) motion, where the allegations are accepted as true, and a complaint is sufficient if it puts a defendant on notice of what the claim is and the grounds upon which it rests. *See Twombly*, 550 U.S. at 555.

The CAC plainly alleges from where petcoke and coal dust migrated (from the Storage Facilities), that such migration was a result of Storage/Distribution Defendants' actions and inaction, and that it has interfered with Plaintiffs' and Class members' reasonable use and enjoyment of their property. *See* CAC ¶¶ 4–16, 49, 51, 71, 80, and Exh. G.

The migration of petocke and coal dust from the Storage Facilities has had a negative effect on Plaintiffs' ability to reasonably use and enjoy their own property. Petcoke and coal dust from the Storage Facilities have settled on Plaintiffs' property, including their homes, vehicles, lawn furniture, outdoor recreation equipment, pools, holiday decorations, and other possessions, leaving an unsightly and dangerous black coating. *Id.* ¶ 50. And, petcoke and coal dust from the Storage Facilities has also infiltrated the interior of Plaintiffs' and Class members' homes through windows, vents, chimneys, air conditioners, and doors, and has been tracked in their homes through the entry of people and pets. *Id.* ¶ 51. On account of petcoke and coal dust from the Storage Facilities, Plaintiffs have been forced inside on windy days, backyard swimming pool use has been limited, and other outside activities, such as barbeques and picnics, have been limited and made difficult. *Id.* ¶ 49.

Nothing more is required to defeat a Rule 12(b)(6) motion. *Compare Chi. Flood Litig.*, 680 N.E.2d at 278 ("Typical examples [of a private nuisance] would be smoke, fumes, dust . . . produced by defendant on his own land and impairing the use and enjoyment of neighboring

land."); *see also Patterson v. Peabody Coal Co.*, 122 N.E.2d 48, 52 (Ill. App. Ct. 1954) (finding jury question existed on nuisance claim where a substantial deposit of coal dust on the plaintiff's premises from a coal washer and drier located about one quarter of a mile away); *Wheat v. Freeman Coal Mining Corp.*, 319 N.E.2d 290, 295–96 (Ill. App. Ct. 1974) (allegations that the operations of the defendant's mine caused large amounts of coal dust and smoke to come onto the plaintiffs' property adequately stated causes of action for nuisance and negligence); *Winters v. Winters*, 78 Ill. App. 417 (1898) (a grain threshing machine within 200 feet of the plaintiff's dwelling caused dust, chaff, and smoke to blow into the plaintiff's house and created a nuisance).

KCBX Defendants consistently misconstrue the applicable pleading standard. KCBX Defendants demand to know the specific amount of petcoke and coal dust that landed on Plaintiffs' property, the specific amount of time that the petcoke and coal dust remained on Plaintiffs' property, each and every date on which the wind blew petcoke and coal dust onto Plaintiffs' property, and "a description of the circumstances under which such migration took place." *See* KCBX Memo. p. 9. Such specifics are not required to state a claim for private nuisance, even at trial, or to put KCBX Defendants on notice of the nature of the claims against them.

Beemsterboer Defendants misconstrue the law and Plaintiffs' allegations in arguing that Plaintiffs failed to allege that Beemsterboer Defendants' actions or inactions were negligent, intentional, "outrageous," or done "with knowledge." *See* Beemsterboer Memo. pp. 4–5. Briefly, as set forth above and throughout the CAC, Plaintiffs allege that Beemsterboer Defendants acted negligently. No further state-of-mind allegations are required. Nevertheless, Plaintiffs also allege that Beemsterboer Defendants "knew or should have known" that their conduct would result in harm to Plaintiffs and the Class, and that Beemsterboer Defendants acted

"with a reckless and outrageous indifference to the high risk of harm posed by [their conduct]." *See* CAC ¶¶ 70, 72.

Beemsterboer Defendants are also wrong in asserting that "Plaintiffs do not allege the conditions they complain of are objectively unreasonable to the 'reasonable person' in the heavily industrialized zone in where all parties reside." *See* Beemsterboer Memo. pp. 4–5. The fact that Plaintiffs reside within the Southside of Chicago does not make it acceptable for their homes and properties to be contaminated and polluted with petcoke and coal dust, as Beemsterboer Defendants suggest. Putting aside the offensive nature of this argument, the CAC plainly pleads facts demonstrating that the petcoke contamination was unreasonable. *See Chi. Flood Litig.*, 680 N.E.2d at 278 ("This court has repeatedly described a nuisance as something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable.") (citation omitted). Additionally, Beemsterboer Defendants ignore that this community is at the center of a national environmental restoration campaign known as the Millennium Reserve–Calumet Core, having been environmentally scarred and vulnerable from serving as a center of steel production and petroleum refining for decades. *See* CAC ¶ 45. This argument is shameful and demonstrates a corporate culture of utter indifference to the lives and well-being of the residents who live near their Storage Facilities.

Finally, DTE incorrectly states that "Plaintiffs concede that DTE's involvement with the Burley Terminal ceased prior to any alleged nuisance even occurring." *See* DTE Memo. p. 5. Plaintiffs allege that DTE sold the Burley Terminal in December 2012. *See* CAC ¶¶ 19, 22. Plaintiffs do not allege that the wrongful conduct on the part of DTE or any Defendant, including trespass, nuisance, and/or negligence, started to occur only after December 2012.

10

### B. Plaintiffs' Private Nuisance Claim Against BP Is Well Pleaded

BP first argues that Plaintiffs have not pleaded sufficient facts to state a claim for nuisance against it. This is not correct. BP actively participated in and allowed petcoke to be transported, distributed, and stored in such a manner that caused petcoke to be released into the air in and around Plaintiffs' and Class members' properties and deposited onto the properties of Plaintiffs and Class members. *Id.* ¶ 75. The CAC alleges that BP is well aware of the potential for petcoke to constitute a private nuisance. See *Id.* ¶ 41 (at the Whiting Refinery, "[u]nder [BP's] federal permit and consent decree with the U.S. EPA, the [petcoke] waste is surrounded by 40-foot walls; an enclosed conveyor and loading system is equipped with wind screens and water sprayers to keep dust down."). After approximately five days, petcoke was and continues to be transported to the Storage Facilities where, unlike at the Whiting Refinery, petcoke was and continues to be stored outside in large, uncovered piles that are sometimes as high as five stories. *Id.* ¶ 44.

The CAC alleges that the contaminations and invasions of Plaintiffs' and the other Class members' properties were the direct and foreseeable result of BP's actions and inactions. Specifically, the CAC alleges that BP knew or reasonably should have known that Storage/Distribution Defendants were not taking, and would not take, reasonable and adequate measures to ensure that petcoke being stored at the Storage Facilities would not migrate into surrounding communities and contaminate the properties of Plaintiffs and Class members. *Id.* ¶¶ 76, 78–79. BP is and has been aware of Storage/Distribution Defendants' failure to reasonably secure petcoke at the Storage Facilities, resulting in petcoke being blown onto and contaminating and invading property owned by Plaintiffs and other Class members. *Id.* ¶ 77.

BP seeks to evade liability by presenting its distorted view of causation, relying on *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), and the Restatement (Second)

11

of Torts § 834, for the proposition that "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also *when he participates to a substantial extent in carrying it on*." *See* BP's Memo. p. 6 (citing Restatement (Second) of Torts § 834) (emphasis in original). The *Beretta* Court expressly found that:

> Section 824 and comment b do not provide the answer to the question of whether the alleged conduct of defendants constitutes a legal cause of the claimed nuisance. Rather, comment b merely poses the question—Is the conduct of these defendants a legal cause of the alleged interference with a public right? The answer to this question must be found elsewhere.

*Beretta,* 821 N.E.2d at 1133; *see also City of Chi. v. Am. Cyanamid Co.*, 823 N.E.2d 126, 137 (Ill. App. Ct. 2005) (noting that "the *Beretta* court criticized the appellate court below, whose decision it reversed, for its reliance on section 824 of the Restatement (Second) of Torts"). Contrary to BP's intimations, the *Beretta* Court and subsequent Illinois Courts have emphasized that foreseeability is the touchstone of legal cause in a nuisance claim:

> Legal cause will be found if reasonable persons in the retail business of selling firearms would have seen the creation of the nuisance in the city of Chicago as a likely result of their conduct. . . . The question then becomes entirely one of foreseeability.

*Beretta*, 821 N.E.2d at 1134–35.

As set forth above, Plaintiffs adequately allege that "BP recognizes the dangers of storing, handling, and transferring petcoke and the necessity that such operations be conducted in as closed an environment as possible," CAC ¶ 74, and that "BP knew or reasonably should have known that the Storage/Distribution Defendants were not taking, and would not take, reasonable and adequate measures to ensure that petcoke being stored at the Storage Facilities would not migrate into surrounding communities and contaminate the properties of Plaintiffs and Class members." *Id.* ¶ 76. "BP is and has been aware of Storage/Distribution Defendants' failure to reasonably secure the petcoke at the Storage Facilities," *id.* ¶ 77, yet acted "with a reckless and

outrageous indifference to the high risk of harm posed by such conduct." *Id.* ¶ 81. Such allegations are more than sufficient to state a cause of action for private nuisance against BP.

## III. Plaintiffs' Trespass Claim Is Well Pleaded

"A trespass is an invasion in the exclusive possession and physical condition of land." *Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, 668 N.E.2d 223, 230 (Ill. App. Ct. 1996). In Illinois, one may be liable in trespass for causing a thing or a third person to enter the land of another either through a negligent act or an intentional act; unlawful intent is not necessary to state a valid claim. *See id.*; *Dial v. City of O'Fallon*, 411 N.E.2d 217, 220 (Ill. 1980); *see also Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*, 135 F.3d 526, 529 (7th Cir. 1998) ("Trespass is a strict liability tort.").

Storage/Distribution Defendants argue that Plaintiffs do not allege that Storage/Distribution Defendants engaged in any tortious conduct, relying heavily on *Village of DePue v. Viacom International, Inc.*, 632 F. Supp. 2d 854, 865 (C.D. Ill. 2009), for the proposition that "merely pointing to the migration of hazardous substances is not enough." Storage/Distribution Defendants' failure to provide *any* further discussion of the applicability of that case is telling. *See* KCBX Memo. pp. 9–10; Beemsterboer Memo. pp. 8–9; DTE Memo. pp. 9–10.

Storage/Distribution Defendants ignore the unique facts of *Village of DePue*, which included a long-ago abandoned smelting facility that contaminated the property decades prior to the filing of the plaintiff's lawsuit. 632 F. Supp. 2d at 857. After much investigation and subsequent litigation, the defendant's corporate predecessors entered into a consent order with the State of Illinois, pursuant to which the defendant's corporate predecessors were to conduct remedial investigations, and eventually begin permanent remediation. *Id.* at 857–58. Dissatisfied with the defendant's progress, the plaintiff brought suit against the defendant, alleging that "[t]he

existence of the toxic abandoned manufacturing site owned by Exxon Mobil and Viacom/CBS is a common law nuisance." *Id.* at 865 (alteration in original). The court noted that the plaintiff "does not incorporate any other allegation to support its nuisance claim, nor does the [plaintiff] cross-reference any attachment to the Amended Complaint to support the claim." *Id.* at 865 n.12. The court ultimately concluded that the plaintiff failed to plead any tortious conduct by the defendant, as the contaminated site's "mere existence, absent some specific unreasonable conduct by Defendants, is not a proper basis for a nuisance claim." *Id.* at 865 (using the same reasoning in dismissing the plaintiff's trespass claim). The plaintiff was required to plead "unlawful or negligent conduct" on the part of the defendant. *Id.*

In contrast, Plaintiffs allege specific unlawful, negligent, and otherwise ongoing tortious conduct on the part of Storage/Distribution Defendants. As set forth above, petcoke and coal dust are highly susceptible to becoming airborne, and it was foreseeable to Storage/Distribution Defendants that their failure to implement and maintain reasonable and adequate measures to prevent petcoke and coal dust from becoming airborne would cause damage to Plaintiffs and the Class members. Storage/Distribution Defendants therefore had a duty to implement and maintain such measures, and they negligently, intentionally, or otherwise unlawfully breached their duty by failing to implement and maintain such measures, resulting in Plaintiffs' damages. *See* CAC ¶¶ 93–100.

Indeed, similar allegations have supported successful trespass actions in the State of Illinois for over a century. *See, e.g.*, *Chicago-Virden Coal Co. v. Wilson*, 67 Ill. App. 443, 444–45 (1896) (piles of slack, or fine coal, gave off smoke, gas, and dust that were carried into the plaintiff's house, causing the plaintiff discomfort and interference with the use of his home); *Winters v. Winters*, 78 Ill. App. 417, 418 (1898) (a grain threshing machine within 200 feet of the

plaintiff's dwelling caused dust, chaff, and smoke to blow into the plaintiff's house, causing annoyance to the plaintiff and damage to his furniture).

DTE and the KCBX Defendants argue that the CAC does not contain any facts as to the nature, quantity, location, or duration of any invasions of Plaintiffs' properties. They are wrong. Plaintiffs allege that petcoke and coal dust emanated from the Storage Facilities onto Plaintiffs' property (*i.e.*, the "nature" of the invasions). *See* CAC ¶¶ 4–14, 49–51, 55, 94–100. Plaintiffs also allege the address of their properties and of the Storage Facilities (*i.e.*, the "location" of the invasions). *See id.* ¶¶ 1 n.1, 5–14, 17–24.

To the extent that these Defendants demand more, such over-specific factual demands are inappropriate in the context of a Rule 12(b)(6) motion, where the allegations are accepted as true, and a claim for relief is adequately alleged when it puts a defendant on notice of what the claim is and the grounds upon which it rests. *Twombly*, 550 U.S. at 555. DTE and the KCBX Defendants obviously do not need to know the exact "quantity" of coal and petcoke dust on Plaintiffs' property, nor do they need to know the precise "duration" of such an invasion, in order to be apprised of the claims against them.

## IV.    Plaintiffs' Negligence Claim Is Well Pleaded

The elements of a claim for negligence are duty, a breach of that duty, proximate cause, and damages. *Fed. Deposit Ins. Corp. v. Amy*, No. 13 C 5888, 2014 WL 1018136, at *2 (N.D. Ill. Mar. 13, 2014). The CAC pleads specific, non-conclusory facts regarding each element of Plaintiffs' negligence claim. Storage/Distribution Defendants are wrong in asserting that the detailed 84-page CAC contains only "vague, conclusory statements," and that Plaintiffs have failed to plead "specific facts" as to foreseeability, duty, breach, and causation. *See* KCBX Memo. pp. 10–11; Beemsterboer Memo. pp. 9–10; DTE Memo. pp. 10–11.

### A. The CAC Pleads That Storage/Distribution Defendants Own, Operate, Maintain, and/or Control the Storage Facilities and Petcoke

The CAC pleads that each Storage/Distribution Defendant owns, operates, maintains or controls, or has owned, operated, maintained, or controlled one or more of the Storage Facilities containing the petcoke that is the subject of this lawsuit, *to wit*:

- KCBX owns, operates, maintains, and/or controls the 100th Street Terminal and the Burley Terminal. *See* CAC ¶ 17.

- Until December, 2012, DTE owned, operated, maintained, and/or controlled the Burley Terminal and the property on which the Burley Terminal is located. *Id.* ¶ 22.

- Since December, 2012, KMR has owned the property on which the Burley Terminal is located. *Id.* ¶ 19.

- Until February 8, 2007, Calumet Transload owned, operated, maintained, and/or controlled the Burley Terminal and the property on which the Burley Terminal is located. *Id.* ¶ 23. Upon information and belief, Calumet Transload continues to operate, maintain, and control the Burley Terminal. *Id.*

- Beemsterboer and Beemsterboer Slag own, maintain, and/or control the 106th Street Terminal. *Id.* ¶ 20.

- Upon information and belief, Koch Carbon owns, maintains, and/or controls a substantial amount of petcoke and coat dust that is stored and transferred at the 100th Street Terminal, Burley Terminal, and 106th Street Terminal. *Id.* ¶ 24.

The CAC also clearly states that Storage/Distribution Defendants store large uncovered piles of petcoke and coal dust at the respective Storage Facilities that each of the Storage/Distribution Defendants owns, operates, maintains, and/or controls. *Id.* ¶¶ 17, 20–22, 44. These piles of petcoke and coal dust sometimes reach as high as five (5) stories. *Id.* ¶ 44.

### B. Storage/Distribution Defendants Had a Duty to Act with Reasonable Care and Breached that Duty

Storage/Distribution Defendants had a duty to act with reasonable care in owning, operating, controlling and/or maintaining the Storage Facilities and in storing, distributing, and selling petcoke and coal dust in such a way that it would not migrate onto and contaminate

16

Plaintiffs' and Class members' property. *Id.* ¶ 102; *see also Nelson v. Union Wire Rope Corp.*, 199 N.E.2d 769, 779 (Ill. 1964) ("It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons."). This duty is plainly set forth in the Complaint. *Id.* ¶ 102.

Storage/Distribution Defendants breached their duty by:

a. Failing to own, operate, maintain, and/or control the Storage Facilities in a manner that would prevent petcoke and coal dust from blowing from the Storage Facilities into the air and onto the homes, property, and businesses of Plaintiffs and Class members;

b. Failing to take adequate measures to suppress the petcoke and coal dust so as to prevent the migration of petcoke and coal dust from the Storage Facilities into the air and onto the homes, property, and businesses of Plaintiffs and Class members;

c. Failing to maintain adequate petcoke and coal dust suppression systems at the Storage Facilities;

d. Failing to adequately contain or cover the piles of petcoke and coal dust at the Storage Facilities so as to prevent petcoke and coal dust from migrating into the air and onto the homes, property, and businesses of Plaintiffs and Class members;

e. Owning, operating, controlling, and/or maintaining the Storage Facilities in an unreasonable manner;

f. Failing to remediate the damage to the homes, property, and businesses of Plaintiffs and Class members caused by petcoke and coal dust; and

g. Otherwise failing to own, operate, maintain and/or control the Storage Facilities in a reasonable manner so as to avoid damaging, diminishing the value of, and interfering with Plaintiffs' and Class members' reasonable use and enjoyment of, their homes, businesses, and property.

*See* CAC ¶ 103.

Indeed, the Illinois Environmental Protection Agency ("IEPA") issued a violation notice to Beemsterboer, alleging violations of environmental laws, regulations, or permits, including that Beemsterboer caused, threatened, or allowed the discharge of particulate matter into the atmosphere generated during material handling and storage operations causing or tending to cause air pollution. *Id.* ¶ 46–47, Exh. F.

The Illinois Attorney General also filed a Complaint against KCBX, alleging it left piles of petroleum coke and coal uncovered and open to the environment, and that:

> Petroleum coke and coal dust is a type of particulate matter that can be emitted into the environment and carried by the wind into areas surrounding the Site. When petroleum coke and coal dust is blown off the Site into the nearby residential neighborhood, the dust gets into people's eyes, is inhaled and coats people's homes, outside play areas, cars and other personal property, thereby threatening human health and unreasonably interfering with the local residents' enjoyment of life and property.

*Id.* ¶ 48, Exh. G.

KCBX Defendants demand to know the specific dates on which they breached their duty to Plaintiffs and Class members. Such unnecessary detail is not required at this early stage of the pleadings to put KCBX Defendants' on notice as to the nature of the claims against them. *See* KCBX Memo. p. 10. Intuitively, such a demand is particularly unreasonable in this case, where Plaintiffs have suffered damages from the migration of petcoke and coal dust from the Storage Facilities on a near daily basis throughout the duration of the Class period.

Plaintiffs have alleged sufficient factual content to support a reasonable inference that Storage/Distribution Defendants breached their duty to Plaintiffs and Class members, and there exists a reasonable expectation that discovery will reveal additional evidence of wrongdoing. *Cf. Amy*, 2014 WL 1018136, at *1.

**C. It Was Foreseeable that the Uncovered Storage and Distribution of Petcoke and Coal Dust at the Storage Facilities Would Result in Harm to Plaintiffs**

The CAC pleads that petcoke is a light, dust-like substance that is highly susceptible to becoming airborne and inhaled (*Id.* ¶¶ 27, 29) and that it was and remains foreseeable to Storage/Distribution Defendants that their failure to implement and maintain reasonable and adequate measures to ensure that petcoke and coal dust from the Storage Facilities was not blown into surrounding communities would result in Plaintiffs and Class members suffering damage to their property. *Id.* ¶ 104. Indeed, other facilities that store petcoke have enclosed it. For example, the piles of petcoke at the Port of Los Angeles were completely covered in 2002 due to the hazardous nature of petcoke that was blowing off those piles into the community. *Id.* ¶ 58, Exh. H. Furthermore, BP contains the petcoke that it produces at Whiting with 40-foot walls before it ships the petcoke off of its premises. *Id.*

**D. Plaintiffs Were Damaged as a Result of Storage/Distribution Defendants' Breaches**

Plaintiffs allege that their homes and yards have been contaminated by petcoke and coal dust emanating from the Storage Facilities as a direct and proximate result of the Storage/Distribution Defendants' actions and failure to act. CAC ¶¶ 5–14, 105. Consequently, the values of Plaintiffs' and Class members' homes have been reduced, and they have been deprived of the reasonable use and enjoyment of their property. *Id.*

Moreover, Plaintiffs alleged that they "have expended and, unless protected from petcoke and coal dust emanating from the Storage Facilities in the future, will expend in the future large sums of money for replacing, repairing, and/or remediating the damage to their property." *Id.* ¶ 56. Plaintiffs "have been required to wash the unsightly black petcoke and coal dust off their homes, vehicles, and other property to maintain an acceptable aesthetic condition and prevent

their property from acquiring an unseemly smell as a result of the high sulfur content of petcoke emanating from the Storage Facilities." *Id.* ¶ 53. Plaintiffs' property, clothing, carpeting, upholstery, and other furnishings have been permanently stained, and the petcoke emanating from the Storage Facilities has ruined Plaintiffs' perishable items such as food and beverages, and has clogged Plaintiffs' air and water filters. *Id.* ¶¶ 54–55.

KCBX Defendants argue that Plaintiffs have not pled any facts showing that they suffered damages "without any intervening cause." *See* KCBX Memo p. 11. The argument is meritless. KCBX Defendants do not purport to identify any intervening cause, nor do they explain how the existence of other Defendants would necessarily create any intervening cause. KCBX Defendants are liable for their breach of duty to Plaintiffs and the Class, as are the other Storage/Distribution Defendants. The migration of petcoke and coal dust onto Plaintiffs' properties as a result of KCBX Defendants' actions and inaction was unimpeded and unaffected by any additional migration of coal and petcoke dust onto Plaintiffs' properties as a result of the other Storage/Distribution Defendants' conduct.

## V. Plaintiffs' Abnormally Dangerous Activity Claim Is Well Pleaded

Under the abnormally dangerous activities doctrine, persons are subject to liability if they engage in "a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings." *Chi. Flood Litig.*, 680 N.E.2d at 279 (quoting W. Keeton, Prosser & Keeton on Torts § 78, at 547–48 (5th ed. 1984)). When determining whether conduct constitutes an abnormally dangerous activity, courts consider the following factors:

> (1) the existence of a high degree of risk of some harm to the person, land or chattels of others; (2) likelihood that the harm that results from it will be great; (3) inability to eliminate the risk by the exercise of reasonable care; (4) extent to which the activity is not a matter of common usage; (5) inappropriateness of the

20

activity to the place where it is carried on; and (6) extent to which its value to the community is outweighed by its dangerous attributes.

*Chi. Flood Litig.*, 680 N.E.2d at 279 (quoting Restatement (Second) of Torts § 520 (1977)). All six factors must be considered when determining whether a defendant has engaged in abnormally dangerous activity—no single factor or group of factors is controlling. *Id.* at 280.

Plaintiffs allege that the uncovered storage and distribution of petcoke in an area subject to moderate to high winds and in close proximity to densely-populated neighborhoods constitutes abnormally dangerous activity (the "Activity"). CAC ¶ 83. Analysis of Plaintiffs' allegations in light of the foregoing factors makes clear that Plaintiffs have stated a claim for abnormally dangerous activity.

### A. The Activity Is Not a Matter of Common Usage, Was Highly Inappropriate and Unsafe Where Carried Out, and the Dangers of the Activity Far Outweigh Any Negligible Value to the Community

The uncovered storage and distribution of petcoke in an area subject to moderate to high winds and in close proximity to densely populated neighborhoods is not a matter of common usage, is highly inappropriate and unsafe when carried out in such a location, and the dangerous attributes of such activity far outweigh any potential benefits to the community relating to same. *Id.* ¶¶ 87–88. None of the Defendants contest that these three factors support defining Defendants' conduct as abnormally dangerous.

### B. It Was Highly Likely, if Not Certain, that the Activity Would Result in Significant Harm

It was highly likely, if not certain, that significant harm would result from Defendants' uncovered storage and distribution of petcoke in close proximity to densely-populated neighborhoods regularly subject to moderate to high winds. *Id.* ¶ 83. Petcoke is a black, lightweight, dust-like, highly flammable substance; is susceptible to being transported by wind and inhaled; and exposure to petcoke is dangerous and can cause skin, eye, and respiratory tract

irritation. *Id.* ¶¶ 2, 29. It was virtually certain that the uncovered storage of petcoke at the Storage Facilities would result in petcoke being blown into, contaminating, and polluting neighborhoods surrounding the Storage Facilities and that such contamination would result in significant harm to persons living in and property located in such neighborhoods. *Id.* ¶¶ 84–85. Defendants fail to seriously challenge this fact.

Only one defendant, DTE, even attempts to directly address these factors. Attempting to redefine the conduct at issue, DTE asserts that Plaintiffs were required to but did not allege that the storage of petcoke in its normal state creates a great risk of harm.  In fact, the activity at issue is the uncovered storage and distribution of petcoke in an area subject to moderate to high winds and in close proximity to densely-populated neighborhoods—not the storage of petcoke in and of itself. DTE's attempt to re-write Plaintiffs' allegations is off-base.

## C.   It Would be Extremely Difficult to Eliminate the Risks Posed by the Activity

It would be extremely difficult, if not impossible, to eliminate the risks posed by the uncovered storage of petcoke in an area subject to moderate to high winds and in close proximity to densely-populated neighborhoods. CAC ¶ 86.

To the extent Defendants contend that this factor is controlling or should be entitled to more weight than other factors, they are wrong. The Illinois Supreme Court has expressly rejected such an approach, instructing that all six factors must be considered in determining whether an activity is abnormally dangerous and that no single factor or group of factors is controlling. *Chicago Flood Litig.*, 680 N.E.2d at 280.

Beemsterboer Defendants, Calumet Transload, and KCBX Defendants are wrong in asserting that an activity can only be abnormally dangerous if it can never be done safely under any circumstance. The Restatement (Second) of Torts, which the Illinois Supreme Court has

looked to in defining abnormally dangerous activity, expressly rejects such an approach, instructing that "[i]t is not necessary . . . that the risk be one that no conceivable precautions or care could eliminate." Restatement (Second) of Torts § 520 cmt. h. The Restatement explains:

> There is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on. Thus almost any other activity, no matter how dangerous, in the center of the Antarctic continent, might be expected to involve no possible risk to anyone except those who engage in it.

*Id.* The abnormally dangerous activity doctrine was never intended to be limited to issues involving the use of atomic energy. Beemsterboer Defendants', Calumet Transload's, and KCBX Defendants' attempt to limit the doctrine in this manner is contrary to established law.

In a related argument, Defendants wrongly assert that Plaintiffs' abnormally dangerous activity claim is forfeited on account of their allegation that "Defendants have refused, and continue to refuse, to take sufficient corrective measures, such as covering or enclosing the piles of petcoke and coal." CAC ¶ 57. The abnormally dangerous activity at issue is the *uncovered* distribution and storage of petcoke in an area subject to moderate to high winds and in close proximity to densely-populated neighborhoods. *Id.* ¶ 86 (italics added). Of course, the uncovered storage of petocke is fundamentally different from the covered storage of petcoke. Moreover, as noted above, precautions can be taken to eliminate the dangers of virtually any activity, with the exception of perhaps the use of atomic energy. Defendants' argument is contrary to extant law.[1]

Defendants are wrong in contending that Plaintiffs' abnormally dangerous claim stems from negligence and, as such, are barred. Plaintiffs' abnormally dangerous activity claim stems

---

[1] KCBX Defendants cite to Paragraph 103 of the CAC—which references, among other things, Defendants' failure to take adequate measures to suppress the migration of petcoke and coal dust—in an attempt to support this argument. Paragraph 103 is part of Plaintiffs' Negligence claim against Storage/Distribution Defendants. Paragraph 103 is not incorporated into Plaintiffs' abnormally dangerous activity claim. Thus, Paragraph 103 is of no relevance to Plaintiffs' abnormally dangerous activity claim.

from the inherently dangerous nature of the activity, not carelessness as Defendants suggest. Moreover, the Illinois Supreme Court has expressly instructed that a "defendant's negligence or lack thereof is irrelevant" to an abnormally dangerous activity claim. *Chicago Flood Litig.*, 680 N.E.2d at 279.

Defendants are misguided in attempting to analogize the facts of this case with those at issue in *Indiana Harbor Belt Railroad Co. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990). In *Cyanamid*, a railroad car carrying acrylonitrile, a hazardous chemical, leaked on its way from New Orleans to New Jersey, and the plaintiffs alleged transporting acrylonitrile by rail and in bulk through the Chicago metropolitan area was an abnormally dangerous activity. *Id.* at 1175. In granting summary judgment for the defendant on the plaintiffs' abnormally dangerous activity claim, the court found that (1) the leak was caused by carelessness, not the inherent properties of acrylonitrile; (2) a ruling in the plaintiffs' favor would operate to impose strict liability on every shipper of hazardous chemicals for the consequences of an accident that occurred while such chemicals were being transported through a metropolitan area; and (3) the railroad network is a hub-and-spoke network, with Chicago being one of the nation's largest railroad hubs, and it is unlikely that all hazardous chemicals could be rerouted around metropolitan areas, except at prohibitive cost. *Id.* at 1176–82.

Here, in contrast to *Cyanamid*, the uncovered storage and distribution of petcoke in an area that is regularly subject to moderate to high winds and in close proximity to densely-populated neighborhoods is inherently dangerous—Plaintiffs' claim does not rest upon carelessness. Additionally, recognizing the activity as abnormally dangerous would not impose an effective industry-wide ban on the transportation of numerous chemicals and there is no

reasonable public policy rationale supporting the uncovered storage and distribution of petcoke in the midst of Chicago's Southside. *See* CAC ¶ 83. Thus, *Cyanamid* is readily distinguishable.

Defendants' attempts to analogize this case with *In re Chicago Flood Litigation*, No. 93 C 1214, 1993 WL 239041 (N.D. Ill. June 28, 1993), are similarly misguided. The *Chicago Flood* court found that: (1) pile driving is not inherently dangerous, is a matter of common usage, and does not pose such a high degree of risk when conducted with due care to warrant designation as an abnormally dangerous activity; (2) there was not a high degree of probability that the harm caused by pile driving over the underground tunnel would be great; (3) there was no basis for concluding that the risks involved in the pile driving at issue could not have been eliminated by exercise of reasonable care; (4) there was nothing inappropriate about a riverbed as a site for pile driving; and (5) the benefits of pile driving to the community outweighed the potential costs. *Id.* at *7. The facts here are patently different. As noted above, the uncovered storage and distribution of petcoke in an area subject to moderate to high winds and in close proximity to densely-populated neighborhoods is inherently dangerous; is not a matter of common usage; was highly inappropriate and unsafe where carried out; it would be difficult, if not impossible, to eliminate the risks inherent in such activity; and the costs of such activity far outweigh any negligible benefit to the community.

### D. BP Mischaracterizes Plaintiffs' Abnormally Dangerous Activity Claim

BP mischaracterizes Plaintiffs' abnormally dangerous activity claim, asserting that such claim is limited to storage. As noted above, Plaintiffs' claim relates to the uncovered distribution and storage of petcoke in an area that is regularly subject to moderate to high winds and in close proximity to densely-populated neighborhoods that constitutes an abnormally dangerous activity. CAC. ¶ 83. Much of the petcoke stored at and distributed through the Storage Facilities was produced by BP's Whiting Refinery and transported to the Storage Facilities. *Id.* ¶ 42. Such

25

allegations are sufficient to support that BP was involved in the distribution of petcoke. Nothing more is required at this stage.

## VI.    Plaintiffs State a Claim for Strict Liability in Tort

Defendants' collective efforts to dismiss the claim for strict liability in tort ignore or misconstrue large portions of the CAC and disregard the underlying purpose and broad remedial reach of strict liability claims in Illinois.

> [T]he purpose of strict liability in tort is to place the loss caused by defective products on those who create the risks and reap the profits by placing such products in the stream of commerce. The rationale underlying this liability is threefold: (1) the public interest in human life and safety demands broad protection against the sale of defective products; (2) the manufacturer solicits and invites the use of his products by representing that they are safe and suitable for use; and (3) the losses caused by defectively dangerous products should be borne by those who have created the risks and reaped the profits by placing the products into commerce.

*Trans States Airlines v. Pratt & Whitney Can., Inc.*, 682 N.E.2d 45, 53 (Ill. 1997) (citations omitted). Here, there can be no serious dispute that Defendants created the risk of the petcoke settling on Plaintiffs' property thereby inhibiting their use and enjoyment of their homes and that all the Defendants profited handsomely off the sale of this inherently dangerous product and their handling of it.

### A.    The CAC Pleads All of the Elements for Strict Liability Based on Product Defect

Plaintiffs assert a cause of action for strict liability in tort due to product defect. "Under Illinois law, the elements of a claim of strict liability based on a defect in the product are: (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control,

and (4) an injury to the plaintiff, (5) that was proximately caused by the condition." *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 345 (Ill. 2008). Each element is well-pled.[2]

First, the nature of the defect has been clearly pled in the CAC. The allegations in the CAC support: (1) that the condition of petcoke was a result of manufacturing and/or design, because it is a toxic byproduct of BP's refinery process with a fine and light particulate size such that it is prone to being blown long distances by wind and which is inherently dangerous as it causes respiratory and other problems to those persons who are exposed to it (CAC ¶¶ 2, 27, 29, 35); (2) that petcoke is unreasonably dangerous because of the health risks involved (*Id.*), as evidenced by the regulatory requirements that imposed obligations on BP related to the handling, storage and transfer of petcoke at its Whiting facility under a Fugitive Air Permit (*Id.* ¶¶ 37, 39); (3) that the condition of the petcoke (both its fine particulate size and inherent properties/characteristics that make it pose a health risk) existed when BP sold the petcoke; (4) that Plaintiffs have been injured because they are not allowed to have the full use and enjoyment of their property and have had to expend time and money to clean up the petcoke (*Id.* ¶¶ 49–56); and (5) that the injuries sustained were a direct result of the amount of the petcoke Plaintiffs have been exposed to (easily blown and easily accumulated) and the nature of petcoke (health risks and staining) (*Id.*). These allegations provide BP and all the other Defendants adequate notice of the claim and demonstrate that the claim is well-pled under *Mikolajczyk*.

Second, the CAC also pleads facts establishing that petcoke is "unreasonably dangerous." There is strict liability when a product is in "a defective condition unreasonably dangerous to the

---

[2] While Beemsterboer Defendants concede that a claim for strict liability may be brought under Illinois law based on "product liability" or a product defect, they argue the CAC contains no such claim. Beemsterboer Memo. p. 7. But, all other Defendants recognize that Plaintiffs are pleading strict liability in tort for product liability. Likewise, Beemsterboer Defendants argue that they should not have to guess what claim they are being charged with—again, a misplaced argument given the well-pled allegations of product defect.

user or consumer or to his property." Restatement (Second) of Torts § 402A (1965). "[T]here is widespread understanding that this bulky liability phraseology really means just one thing—that a product is more dangerous that it properly should be." D. Owen, *Design Defect Ghosts*, 74:3 Brooklyn L. Rev. 927, 937 (2009). The CAC more than adequately alleges the existence of a "defective condition unreasonably dangerous." Most of the law in this area comes from consumer products, but it is also an issue in the production and transportation of industrial products. American Law Institute fellow Charles Cantu surveyed law concerning industrial products from numerous jurisdictions and concluded that "[i]n each of these scenarios [he surveyed], it is the appropriateness of the activity to the surrounding environs that is the controlling issue." C. Cantu, *Distinguishing the Concept of Strict Liability for Ultra-Hazardous Activities From Strict Products Liability Under Section 402A of the Restatement (Second) of Torts: Two Parallel Lines of Reasoning That Should Never Meet*, 35:1 Akron L. Rev. 31, 36 (2001) (hereinafter, "Cantu"). Particularly influential to his summary was his citation to the Illinois case *Miller v. Civil Constructors, Inc.*, 651 N.E.2d 239, 244 (Ill. App. Ct. 1995), which emphasized that the unreasonably dangerous aspect is met "either because of [the activity's] magnitude or because of the circumstances surrounding it." Cantu at 36 n.38.

Causation is also well-pled. Proximate cause consists of two requirements: cause in fact and legal cause. *Id.* Cause in fact is present "if, absent [the defendant's] conduct, the injury would not have occurred." *Abrams v. City of Chicago,* 811 N.E.2d 670, 675 (Ill. 2004) (quotation and citations omitted). "Legal cause, by contrast, is largely a question of foreseeability. The relevant inquiry is whether the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct." *Id.* (quotations and citations omitted) (emphasis in original). Proximate cause is an issue of fact to be determined by the jury. *See id.* at 674.

28

The acts and omissions the CAC attributes to BP establish that BP's conduct is clearly the proximate cause of the injuries complained of. First, if BP had not manufactured and distributed petcoke, the injury of petcoke covering Plaintiffs' properties could not have occurred. Thus, cause in fact is present. Second, the CAC is filled with allegations concerning BP's knowledge of the risks of petcoke, including its susceptibility to being blown around and the health risks it poses, in light of consent decree with the EPA over containment at its own Whiting facility. Thus, legal cause is present.

These facts more than establish the type of circumstantial evidence which is legally sufficient at summary judgment, let alone at the pleading stage. *Compare Ill. Farmers Ins. Co. v. Sunbeam Prods., Inc.*, No. 10-CV-713-JPG-DGW, 2013 WL 1192388, at *7 (S.D. Ill. Mar. 22, 2013) (rejecting summary judgment on causation because "[t]here is evidence from which the jury could reasonably conclude that the blanket was turned on at the time of the fire [because] . . . evidence indicated that on previous occasions the Joneses had accidentally turned on the electric blanket by bumping the switch. Accordingly, there is a genuine issue of material fact concerning whether the electric blanket caused the fire."). Indeed, BP seems to be attempting to inject an element of fault into the proximate causation inquiry. But "[i]n a product liability action based on strict liability, the inability of a defendant to know of or prevent the risk is not a defense because fault is not an issue. . . . A seller who puts a defective product, *i.e.,* an unreasonably dangerous product, into the stream of commerce runs the risk of being held strictly liable for injuries caused by the product, regardless of whether the seller actually knew of the defect, contributed to the defect or failed to discover the defect." *Murphy v. Mancari's Chrysler Plymouth, Inc*, 887 N.E.2d 569, 575 (Ill. App. Ct. 2008). Because BP profited from the sale of the petcoke, it cannot wash its hands of strict liability.

29

BP further attempts to parse the allegations of the CAC in an effort to absolve itself of liability, but such efforts ignore the central allegations of the CAC regarding petcoke it is both the (1) physical characteristics of the product itself (fine, particulate matter that is prone to blowing and settling on property) and (2) inherent nature/composition of the product (potential health risks) that make the product defective. After all, if the "condition of the petcoke" was that it manifests itself in a liquid state or if the petcoke were formed into large chunks, the threat of blowing and settling would be minimized.[3]

BP's argument that it lacks "sufficient notice" of the nature of the claim against it is fastidious at best. *See* BP Memo. p. 11. BP is essentially arguing that it is entitled to a more definite statement under Fed. R. Civ. P. 12(e), but such motions are highly disfavored. *See Rivera v. Lake Cnty.*, 974 F. Supp. 2d 1179, 1195 (N.D. Ill. 2013) ("Motions under Rule 12(e) are disfavored generally, and courts should grant such motions only if the complaint is so unintelligible that the defendant cannot draft responsive pleading."). Further, BP mistakes the nature of its culpability under strict liability, which is not a fault-based determination. BP produced the petcoke in a defective condition and placed it into the stream of commerce. That is all that needs to be pled as regards to BP. But, the CAC pleads far more against BP, including detailed allegations of BP's direct knowledge of the need to properly contain petcoke and its blithe effort to sidestep the storage decrees imposed by the EPA on BP's own property by selling it into the stream of commerce without apparent care or concern as to what its purchaser was doing with the petcoke along the way. CAC ¶¶ 39, 41–43. BP is more than sufficiently on notice of the nature of the claims against it.

---

[3] This also negates DTE's argument that Plaintiffs have not alleged that the petcoke itself is defective. *See* DTE Memo. p. 9.

30

### B.    Strict Liability is Applicable to Landowner Defendants as Lessees

The landowner defendants cannot escape strict liability simply because they are leasing their land to KCBX or because the petcoke is merely being stored on their land. Strict liability is not limited merely to sellers of a defective product, nor are plaintiffs who have standing to pursue such claims limited to users or consumers. The Illinois Supreme Court has long recognized that privity is not required in order to bring a claim in strict liability. *Suvada v. White Motor Co.*, 210 N.E.2d 182 (Ill. 1965). Based on *Suvada* and other Illinois precedent, the district court in *White v. Jeffrey Galion, Inc.*, 326 F. Supp. 751 (E.D. Ill. 1971), provided this cogent analysis, which is on point:

> It seems somewhat incongruous to say that a user or consumer of a product has a right of action against the manufacturer of a defective product, but to withhold protection from an innocent bystander who has suffered injuries through no fault of his own, which injuries were caused by the defective product solely because at the time he received his injury he was not using or consuming the product, but was merely standing by innocently minding his own business when he was suddenly injured by another's use of the defective product.

> It might be argued that the innocent bystander would under such circumstances have a cause of action against the user and the user in turn could then shift his liability back to the guilty manufacturer. This argument is unsound since a jury, if presented with such a factual situation, could find the user not guilty of negligence and therefore grant to the plaintiff nothing for his injuries. Under these circumstances the guilty manufacturer would go away scot-free, and the plaintiff would be required to suffer the burden of his injuries without recompense.

> . . .

> An even more compelling reason why the innocent bystander should be protected appears when we view the situation where a purchaser, consumer or user may see fit to purchase an inferior product in order to reduce costs. Under such circumstances if the burden is to be borne by any one, it should be the manufacturer and the less-than-prudent purchaser and user. Certainly it should not be borne by the innocent bystander. Unless the doctrine is extended to encompass the innocent bystander as well as the user and consumer, very incongruous results will obtain.

*Id*. at 754.

Landowners have been found to be subject to strict liability claims for the acts of independent contractors on their property. *See Bear v. Power Air, Inc.*, 595 N.E.2d 77, 81–82 (Ill. App. Ct. 1992) ("The rationale underlying the inherently dangerous exception to the general rule is that an owner ought to be required to take special precautions, and be liable for not doing so, where an independent contractor, on the owner's property, is engaged in an activity or using an instrumentality which, even when properly and carefully operated, poses a significant risk or injury or damage to others."); *Crowe v. Pub. Bldg. Comm'n of Chi.*, 383 N.E.2d 951, 952 (Ill. 1978) ("the extension of the doctrine of strict liability to the lessor of a defective product is an established principle of law in Illinois."); *Benson v. Unilever U.S., Inc.*, 884 F. Supp. 2d 708, 715 (S.D. Ill. 2012) ("[T]he Illinois Supreme Court did not limit liability to manufacturers and sellers. And in other cases, Illinois courts have been explicit that liability casts a broad net: 'In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers and retailers.'") (citation and quotation omitted).[4]

### VII. Plaintiffs State a Claim for Willful and Wanton Misconduct

Plaintiffs have properly pled a count for willful and wanton misconduct. Defendants' sole argument against this count is that there is no independent tort for willful and wanton misconduct in Illinois, which does not address the question as to whether negligence at the willful and wanton level can and should be separately pled under Illinois law. Defendants ignore the fact that willful and wanton misconduct may be alleged in a separate count because it is an enhanced form

---

[4] This defeats DTE's argument concerning failure to warn. Plaintiffs' claim for strict liability is plainly not based on a failure to warn. DTE Memo. p. 9.

of negligence that enables a Plaintiff to qualify for punitive damages[5] and to negate any

contributory negligence defense.[6]

> The Illinois Supreme Court has made clear that, unlike ordinary negligence:

> A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. . . . [t]he label "willful and wanton conduct" has developed in this State as a hybrid between acts considered negligent and behavior found to be intentionally tortious.

*Ziarko v. Soo Line R.R. Co.,* 641 N.E.2d 402, 405–06 (Ill. 1994) (quoting *Schneiderman v.*

*Interstate Transit Lines, Inc.,* 69 N.E.2d 293 (Ill. 1946)); *see also Sparks v. Starks*, 856 N.E.2d

575, 577 (Ill. App. Ct. 2006) ("willful and wanton misconduct is essentially an aggravated form

of negligence").

    If a plaintiff wishes to avail itself of the advantages of having to prove willful and wanton

conduct, the jury must be so instructed and in fact the Supreme Court in *Ziarko* "cited favorably

to IPI Civil 3d No. 14.01 as the appropriate instruction to give in a willful and wanton case."

---

[5] *See Murray v. Chicago Youth Ctr.*, 864 N.E.2d 176, 190 (Ill. 2007) ("[I]n the context of punitive damages, willful and wanton misconduct 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.'") (quoting *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 530 (Ill. 1992)); *Barton v. Chicago and North Western Transp. Co.,* 757 N.E.2d 533, 555–56 (Ill. App. Ct. 2001) (rejecting proposition that "punitive damages can only be awarded in cases of intentional willful and wanton conduct" and holding instead that punitive damages can also be awarded under the recklessness instruction for willful and wanton misconduct); *see also City of Evanston v. Texaco, Inc.*, No. 13 C 2106, 2014 WL 683736, at *7 (N.D. Ill. Feb. 21, 2014) (denying motion to strike prayer for punitive damages because plaintiffs had plausibly pled willful and wanton conduct and recognizing that, "'[g]enerally, punitive damages are awarded when the underlying tort is accompanied by aggravating circumstances such as willful, wanton, malicious, or oppressive conduct.'" ) (quoting *Chi. Title Land Trust Co. v. JS II, LLC*, 977 N.E.2d 198, 219 (Ill. App. Ct. 2012)).

[6] *See Poole v. City of Rolling Meadows*, 656 N.E.2d 768, 771 (Ill. 1995) (adopting rule that a jury would "be precluded from reducing a defendant's damages by a plaintiff's contributory negligence if the defendant's willful and wanton conduct was intentional"); *Burke v. 12 Rothschild's Liquor Mart, Inc.,* 593 N.E.2d 522, 533 (Ill. 1992) ("the City's liability to Burke is unaffected by Burke's negligence as to" a joint tortfeasor because the City had been found to have engaged in willful and wanton misconduct).

*Tornabene v. Paramedic Servs. of Ill., Inc.,* 731 N.E.2d 965, 971 (Ill. App. Ct. 2000). It is for this reason that a willful and wanton claim can be included in a separate count because it is "a supplemental allegation of negligence" that "is a claim in name only" that a plaintiff is allowed to plead separately. *McCoy v. Iberdrola Renewables Inc.,* No. 11 C 592, 2013 WL 4027045, at *4 (N.D. Ill. Aug. 7, 2013) (denying motion to dismiss the separate pleading of a willful and wanton count).[7] By separately pleading the elements of a negligence claim that is enhanced to a willful and wanton level, Defendants have been placed on notice that Plaintiffs will seek to prove reckless and intentional conduct and thus pursue punitive damages and preclude any assertion of contributory negligence. This why the Illinois Supreme Court has explicitly stated although "[t]here is no separate, independent tort of willful and wanton conduct", a plaintiff can "recover damages based on willful and wanton conduct" by "plead[ing] and proving the basic elements of a negligence claim" as well as "alleg[ing] either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd of Dirs.,* 973 N.E.2d 880, 888 (Ill. 2012) (affirming appellate court's reversal of the dismissal of the "the only count before us" which was willful and wanton conduct).

The purpose of notice pleading is thus served by rejecting Defendants' motion to dismiss the willful and wanton count.

---

[7] *See also Lane v. DuPage Cnty. Sch. Dist. 45,* No. 13-cv-5386, 2014 WL 518445, at *4 (N.D. Ill. Feb. 10, 2014) ("to state a claim for willful and wanton misconduct, which is an aggravated form of negligence under Illinois law, a plaintiff must plead the basic elements of a negligence claim and" the additional elements of willful and wanton conduct); *Drakeford v. Univ. of Chi. Hosps.,* 994 N.E.2d 119, 127 (Ill. App. Ct. 2013) (denying JNOV after trial because "we find there was sufficient evidence to support the jury's verdict on the willful and wanton misconduct count."); *Carter v. New Trier E. High Sch.,* 650 N.E.2d 657, 661–62 (Ill. App. Ct. 1995) (rejecting motion to dismiss willful and wanton count and discussing cases reaching similar conclusions).

**VIII. Plaintiffs' Civil Conspiracy Claim Is Well Pleaded**

Under Illinois law, the "elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). Where an agreement is not overt, "the alleged acts must be sufficient to raise the inference of mutual understanding (*i.e.,* the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chi. Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000).

Plaintiffs' allegations support a mutual understanding among Defendants to sell, transport, and distribute petcoke in a manner that would result in petcoke blowing from the Storage Facilities and polluting and contaminating nearby homes, yards, and neighborhoods. *See* CAC ¶ 111. BP produced petcoke that was transported to the Storage Facilities shortly after being produced at the Whiting Refinery and polluted and contaminated Plaintiffs' homes, yards, and neighborhoods. *Id.* ¶¶ 37–42. Storage/Distribution Defendants each owned, controlled, and/or operated one or more of the Storage Facilities, and/or the land on which a Storage Facility is located, from which petcoke emanated into the surrounding areas. *Id.* ¶¶ 17, 19–23. And, Koch Carbon owned and/or controlled a substantial amount of petcoke and coal dust that is stored and transferred at the Storage Facilities. *Id.* ¶ 24.

Plaintiffs also allege several overt acts in furtherance of such understanding. For example, Petcoke produced at the Whiting Refinery was transported to the Storage Facilities shortly after being produced. *Id.* ¶ 42. Then, during the relevant time period, petcoke and coal dust were stored at the Storage Facilities in vast uncovered piles, sometimes reaching as high as five

stories, in a manner almost certain to result in petcoke and coal dust blowing into, contaminating, and polluting surrounding neighborhoods. *Id.* ¶¶ 43–44.

Plaintiffs are not required to allege more specifics as to the time and place of Defendants' acts in furtherance of the conspiracy. Plaintiffs specifically allege the time, place, unlawful conduct, and understanding giving rise to their claim. Such allegations constitute more than enough specificity to put Defendants on notice as to the bases of Plaintiffs' civil conspiracy claim.

Nor is the civil conspiracy claim improperly duplicative. "The function of the conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's act." *Instant Tech., LLC v. DeFazio*, No. 12 C 491, 2014 WL 1759184, at *22 (N.D. Ill. May 2, 2014) (quoting *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)). As noted above, an understanding to engage in unlawful conduct is a required element of a civil conspiracy claim. It was natural and correct for Plaintiffs to incorporate allegations detailing Defendants' unlawful conduct into their conspiracy claim. Additionally, the fact that allegations as to one count are relevant to and incorporated into a second count, does not in and of itself render the second count duplicative as Defendants appear to suggest. Different causes of action generally serve different purposes. Defendants' approach would result in needless and highly inefficient pleading, by forcing plaintiffs to reallege certain allegations, rather than simply incorporating such allegations by reference.

## IX. Plaintiffs' Declaratory Relief Claim Is Well Pleaded

Defendants' collective effort to dismiss the Declaratory Judgment Act ("DJA") count runs counter to the dictate that the DJA "should be liberally construed to effectuate the ends of justice." *Tamco Corp. v. Fed. Ins. Co. of New York*, 216 F. Supp. 767, 771 (N.D. Ill. 1963) (citation omitted). Given its purpose, the DJA provides district courts with "wide discretion to

provide declaratory relief,"[8] because the DJA "created a new"[9] and "additional remedy,"[10] which is available to interested parties like the Plaintiffs in this case. Such remedies are "appropriate even though other remedies are also available,"[11] and relief under the DJA is proper either as "the basis of further relief necessary or proper against the adverse party"[12] (*e.g.*, to establish a component of liability) or "whether or not further relief is or could be sought."[13]

As the Supreme Court has stated, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Pub. Serv. Comm'n*, 344 U.S. at 243. This sense of "fit" is hardly something that can be easily divined from the pleadings, especially when they are to be construed in the light most favorable to the Plaintiffs.

### A. Alleged Duplicity Is an Insufficient Basis to Dismiss Plaintiffs' Declaratory Relief Claim

BP and KCBX Defendants have moved to dismiss Plaintiffs' Declaratory Judgment Act ("DJA") claim because they are purportedly duplicative. Each brief devotes a mere two sentences to the issue and relies on the same cases for this proposition.

First, BP and KCBX Defendants fail to provide any analysis on how the declarations sought are duplicative of any other claim pled or relief sought by the Plaintiffs. Nor have they attempted to

---

[8] *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 2:12-CV-02441 ES, 2013 WL 2177974, at *18 (D.N.J. May 20, 2013).

[9] *Walker Process Equip., Inc. v. FMC Corp.*, 356 F.2d 449, 451 (7th Cir. 1966) (citation omitted).

[10] *Balanyi v. Local 1031, Int'l Bd. of Elec. Workers AFL-CIO*, 374 F.2d 723, 726 (7th Cir. 1967); *see also Prier v. Steed*, 456 F.3d 1209, 1212 (10th Cir. 2006) ("[Declaratory Judgment Act] enlarge[s] the range of remedies available") (citation omitted).

[11] *Davis v. Romney*, 490 F.2d 1360, 1370 (3d Cir. 1974).

[12] *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 245 (1952).

[13] 28 U.S.C. § 2201.

analogize the facts of this case with the cases they cite. Defendants' boilerplate assertion is wrong as it ignores the fact that Plaintiffs are seeking not only remedies to address past discharge of petcoke, but also future relief to prevent the discharge of petcoke going forward and to remediate damage not yet corrected. (*See* D.E. #63 at 30, Declaration (d).) Such relief is necessary to prevent the accrual of future damages and is in addition to the monetary relief sought by the other claims. It has thus been recognized that "[i]nasmuch as a declaration could aid Plaintiff in the pursuit of *injunctive relief*, it is *not duplicative*." *Consumer Protection Corp. v. Neo-Tech News*, No. 08-cv-1983, 2009 WL 2132694, at *3 (D. Ariz. July 16, 2009) (emphasis added); *see also Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991) (holding that plaintiff can maintain an independent declaratory judgment action where he or she "can demonstrate a good chance of being likewise injured in the future"); *Shephard v. U.S. Olympic Comm.*, 94 F. Supp. 2d 1136, 1149 (D. Colo. 2000) ("The purpose of the Declaratory Judgment Act was to prevent the accrual of avoidable damages.").

Second, at this stage of the litigation, the Defendants' arguments are not ripe because Plaintiffs are allowed to plead in the alternative pursuant to Fed. R. Civ. P. 8(d). In fact, the decisions are legion from district courts throughout the country that it is premature to dismiss claims seeking declaratory and injunctive relief under Rule 12 because Plaintiffs have not moved for an injunction and determination of appropriate relief can be considered only after liability has been established.[14]

---

[14] *See In re Hardieplank Fiber Cement Siding Litig.*, No. 12-MD-2359, 2013 WL 3717743, at *18 (D. Minn. July 15, 2013) (where the defendant argued that the DJA claims were duplicative, the court held that the motion to dismiss the DJA claim was premature, and that "Plaintiffs are permitted to plead in the alternative."); *Saltzman v. Pella Corp.*, No. 06-cv-4481, 2007 WL 844883, at *17 (N.D. Ill. Mar. 20, 2007) (refusing to dismiss the DJA claim under Rule 12(b) standards by finding it "premature to make that determination here"); *Fleisher v. Fiber Composites, LLC*, CIV.A. 12-1326, 2012 WL 5381381, at *13 (E.D. Pa. Nov. 2, 2012) ("it is premature to dismiss Plaintiffs' DJA claim at this point); *Irshad Learning Ctr. v. Cnty. of DuPage*, 804 F. Supp. 2d 697, 719 (N.D. Ill. 2011) ("The court concludes that Defendants' motion to dismiss the claim for injunctive relief is premature."); *Cmty. Programs of Westchester of Jewish Cmty. Servs. v. City of Mt. Vernon*, No. 06 Civ. 3332(SCR)(GAY), 2007 WL 2981915, at *6 n.5 (S.D.N.Y. Oct.

Further, Plaintiffs are also seeking class certification of a Fed. R. Civ. P. 23(b)(2) class. If Plaintiffs are ultimately successful in obtaining class certification, there may be Plaintiffs and Class members whose property has not yet developed visible layers of petcoke or Class members who have not paid to clean up petcoke. Such Class members currently may not have ripe claims under the other causes of action pled in the Complaint and, as to these Class members, there will be no redundancy or duplicity because they will *only* qualify for declaratory relief. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 395 (7th Cir. 2010) (affirming certification of a Rule 23(b)(2) class in which "([members of the (b)(2) class] would want declarations that there is an inherent design flaw, that the warranty extends to them and specific performance of the warranty to replace the windows when they manifest the defect, or final equitable relief. . . . If the district court finds in favor of the class and enters all six declarations, the cumulative effect will be an entitlement to have their windows replaced.").

It is for this reason that DTE's argument in a brief footnote that the DJA claim against it should be dismissed because it "no longer owns, controls, maintains, and/or operates the Burley Terminal, [thus] there are no future steps to be taken" is misplaced. DTE Memo. p. 13. DTE ignores the fact that the DJA claim seeks to hold DTE and the other Defendants liable for "all appropriate damages" (Declaration (f)) and to require DTE to "remedy all past … petcoke and coal dust discharge" (Declaration (e)). DTE's reliance on *Beahringer v. Page*, 789 N.E.2d 1216, 1226 (Ill. 2003), is without merit. First, *Beahringer* involved the application of Illinois'

---

9, 2007) (same); *Lawn v. Enhanced Serv. Billing, Inc.*, No. 10-CV-1196, 2010 WL 2773377, at *6 (E.D. Pa. July 13, 2010) ("This Court will address the issue of remedies, including the possibility of injunctive relief, if there is a finding of liability. We see no need to limit the potential remedies available to Plaintiff at this time, however, and will not dismiss Plaintiff's claim for injunctive relief."); *Lewis v. Bank of Am. NA*, CV 13-7717 CAS VBKX, 2013 WL 7118066, at *14 (C.D. Cal. Dec. 18, 2013) ("At this juncture, it would be premature to find that injunctive relief may not be granted."); *In re Auto. Parts Antitrust Litig.*, 12-MD-02311, 2013 WL 2456584, at *14 (E.D. Mich. June 6, 2013) ("This Court is not in a position, at this stage of the proceedings, to render an assessment that injunctive relief cannot be had.").

declaratory judgment statute and not the federal DJA. Second, the court only dismissed the Illinois declaratory judgment claim because the plaintiff failed to "sufficiently plead that he exhausted his administrative remedies," which is irrelevant to the facts of this case. 789 N.E.2d at 1226. Thus, the DJA claim is appropriately brought against DTE to account for DTE's past conduct as a joint tortfeasor.

Finally, judicial economy is not served by dismissing the DJA claim at this early stage of the proceedings. In fact, if it is true that the DJA claim is purely duplicative of the other claims as Defendants argue, then the Defendants cannot, and have not, pointed to any additional discovery or other activity that would have to occur if the DJA claim is permitted to proceed. Likewise, if the claims are duplicative, then the Court will have to resolve the identical factual issues related to the DJA claim as it would with the other claims such that it would be an efficient use of judicial resources to permit the DJA claim to proceed.

BP and KCBX Defendants each rely on *S & A Futures, LLC--Series 2 v. Sysco Chicago, Inc.*, No. 11 C 7629, 2012 WL 851556 (N.D. Ill. Mar. 13, 2012), and *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752 (N.D. Ill. 2008). *S&A Futures* is inapposite as that case involved a defendant asserting a counterclaim for declaratory relief in a trademark infringement action. The court dismissed the DJA claim because, in that case, the nature of the declaration sought was tantamount to seeking "an advisory opinion where no dispute exists." 2012 WL 851556 at *4–5. Here, there is nothing advisory about the declarations sought by Plaintiffs, as the cumulative effect of the declarations is the award of injunctive relief. In addition, all Defendants concede that an actual dispute exists in this case. In *Vulcan Golf*, the plaintiffs "acknowledge[d]" that their DJA count failed to add anything. 552 F. Supp. 2d at 778. Likewise, in *Classic Bus.*

*Corp. v. Equilon Enterprises, LLC*, No. 09 C 7735, 2011 WL 290431, at *5 (N.D. Ill. Jan. 27, 2011) (cited by KCBX Defendants), the plaintiffs "fail[ed] to address the matter of redundancy."

Here, Plaintiffs dispute that the DJA claim adds nothing to the case; in fact, besides being permitted by rule to plead in the alternative, the DJA claim adds injunctive and declaratory relief as further set forth below. Moreover, neither *Vulcan Golf* nor *Classic Bus.* is helpful in addressing whether or not mere duplicity is a sufficient basis to dismiss a DJA claim at this stage of the proceedings because the issue was not contested or fully briefed there. *See Gen. Ins. Co. of Am. v. Clark Mall, Corp.*, 08C2787, 2010 WL 3765352, at *3 (N.D. Ill. Sept. 16, 2010) (noting that when deciding between conflicting options that full briefing and an adversarial process are best and quoting "truth—as well as fairness—is best discovered by powerful statements on both sides of the question; "the judicial process is at its best only when there are comprehensive briefs and powerful arguments on both sides"; a "judge rarely performs his functions adequately unless the case before him is adequately presented") (citations and quotations omitted). As further set forth above, courts have found that a DJA claim is not duplicative, or have refused to dismiss a DJA claim at this stage of the proceedings because it is premature.

## B. Beemsterboer Defendants' Arguments Directed at the Scope of the Declaratory Relief Claim Are in Error

Beemsterboer Defendants' assertion that the DJA count exceeds allowable boundaries of the DJA is simply wrong. First, these Defendants misapply law concerning relief available in insurance DJA cases that are filed with the liability claim by arguing that "it is inappropriate for a court to decide issues of ultimate fact that could bind the parties to the *underlying litigation*." Beemsterboer Memo. p. 12. They rely solely on *Clark Mall*, 2010 WL 3765352, which is completely inapposite, because *Clark Mall* dealt with the use of the DJA in cases involving insurance disputes (*i.e.* duties to defend, duties to indemnify) where there is also an underlying

41

case for liability pending concurrently with a separate case involving insurance coverage. *See* 2010 WL 3765352, at *2 ("The Seventh Circuit regularly says that decisions about indemnity should be postponed until the underlying liability has been established.") (citation omitted). This insurance-specific law has no bearing on this case, and such an effort to apply *Clark Mall* beyond the insurance context is contrary to the Supreme Court's direction that only "ultimate facts" are appropriate for DJA claims. *See Pub. Serv. Comm'n*, 344 U.S. at 246 ("But when the request is not for ultimate determination of rights but for preliminary findings and conclusions intended to fortify the litigant against future regulation, it would be a rare case in which the relief should be granted.").

Beemsterboer Defendants next argue that certain declarations sought by Plaintiffs seek "far more than 'declaring the rights and other legal relations' of the parties" and are thus "inappropriate". Beemsterboer Memo. p. 12. However, these Defendants do not provide any analysis on how the proposed declarations overstep the permissible bounds of a DJA claim. For example, they do not explain how the declarations seeking to require these Defendants to "take all necessary measures to prevent the discharge of petcoke and coal dust in the future" and to "remedy all past and future petcoke waste discharge" are improper. (D.E. #63 at 30, Declarations (d) and (e).) Nor could they, as these declarations perfectly address the "rights" and "legal relations" of the parties here: Plaintiffs have the right to not be subject to petcoke and coal dust discharge and have a right to have Defendants remedy such discharge.

Defendants' reliance on *Loufrani v. Wal-Mart Stores, Inc.*, No. 09 C 3062, 2009 WL 3787941 (N.D. Ill. Nov. 12, 2009), is misplaced. First, there is nothing in *Loufrani* which addresses the appropriateness of any particular declaration and the Defendants do not even attempt to analogize the facts of this case to those in *Loufrani*. Moreover, the court in *Loufrani*

42

actually denied the motion to dismiss the DJA claim. 2009 WL 3787941 at *7. Finally, the court in *Loufrani* allowed three separate DJA claims despite the fact that each count sought declarations that the use of a mark *would* constitute infringement, a less definite and appropriate use of a DJA claim than what Plaintiffs seek here.

Beemsterboer Defendants' argument that "Plaintiffs request improperly asks this court to micromanage Defendants' permits, which were issued by regulatory authorities" (Beemsterboer Memo. p. 13) is both irrelevant and an issue for trial based on evidence. The challenged declarations would give this Court the authority to require Defendants to "take all necessary measures" without specifying the measures. If Defendants have a problem with any form of relief being considered by the Court under that declaration, they can present evidence that such a declaration would be inequitable. This certainly cannot be decided on a Rule 12 motion without evidence. Indeed, to this point, the Defendants make no mention of the relevance of the fact that they operate under permits issued by regulatory authorities, nor do they explain why this Court owes any deference to such regulatory authorities or how any particular form of relief would constitute interference.

Finally, Beemsterboer Defendants argue that the declaration seeking attorneys' fees cannot be granted. Beemsterboer Memo. p. 13. They fail to cite any authority supporting such a proposition. In addition, this argument ignores the fact that the DJA provides an "additional remedy" and "enlarges the range of remedies available" to Plaintiffs. Thus, there is no basis to dismiss Plaintiffs' DJA claim.

## CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss should be denied in their entirety.

Date: July 15, 2014

Respectfully submitted,


/s/ BEN BARNOW

BEN BARNOW
ERICH P. SCHORK
BARNOW AND ASSOCIATES, P.C.
One N. LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
(312) 641-5504 (fax)
b.barnow@barnowlaw.com
e.schork@barnowlaw.com

JEFFREY A. LEON
JAMIE E. WEISS
ZACHARY A. JACOBS
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, Illinois
(847) 433-4500
(847) 433-2500 (fax)
jeff@complexlitgroup.com

THOMAS A. ZIMMERMAN, JR.
ADAM M. TAMBURELLI
FRANK J. STRETZ
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
(312) 440-4180 (fax)
tom@attorneyzim.com
adam@attorneyzim.com
frank@attorneyzim.com

*Plaintiffs' Interim Co-Lead Counsel*

44

ROBERT JAMES PAVICH
IAN H. LEVIN
JOHN J. PAVICH
PAVICH LAW GROUP, P.C.
20 S. Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (fax)
rpavich@pavichlawgroup.com
ihlevin@gmail.com
jpavich@pavichlawgroup.com

KEVIN ROGERS
LAW OFFICES OF KEVIN ROGERS
307 N. Michigan Avenue, Suite 305
Chicago, Illinois 60601
(312) 332-1188
(312) 332-0192 (fax)
Kevin@KevinRogersLaw.com

ARON D. ROBINSON
LAW OFFICE OF ARON D. ROBINSON
180 W. Washington Street, Suite 700
Chicago, Illinois 60602
(312) 857-9050
Adroblaw@aol.com

JAMES D. BRUSSLAN
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle Street, Suite 1300
Chicago, Illinois 60602
(312) 476-7570
(312) 346-8434 (fax)
jbrusslan@lplegal.com

*Plaintiffs' Counsel*

**Certificate of Service by Electronic Means**

The undersigned hereby certifies that the proceeding document was caused to be served electronically this 15th day of July 2014 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ BEN BARNOW

BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One N. LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
(312) 641-5504 (fax)
b.barnow@barnowlaw.com