ROSALIO CAMPOS, RAYMOND FIGUEROA,
PATRICIA A. FISHER, SUSAN SADLOWSKI
GARZA, JANE GOULD, LILLY MARTIN,
ALFREDO MENDOZA, KEVIN P. MURPHY,
JOANN PODKUL, and JEAN TOURVILLE,
individually and on behalf of all other
persons and entities similarly situated,

     Plaintiffs,

     v.

BP PRODUCTS NORTH AMERICA, INC.,
CALUMET TRANSLOAD RAILROAD LLC,
DTE CHICAGO FUELS TERMINAL, LLC,
GEORGE J. BEEMSTERBOER, INC.,
BEEMSTERBOER SLAG AND BALLAST
CORPORATION, KCBX TERMINALS
COMPANY, KM RAILWAYS, LLC, and
KOCH CARBON, LLC,

     Defendants.

No. 13 CV 8376
No. 13 CV 8499
No. 13 CV 9038
(Consolidated)

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Petcoke is a dust-like byproduct of the crude-oil refining process, and is itself valuable as a fuel. Plaintiffs own properties in Southeast Chicago and seek to represent a class of such property-owners. They allege that petcoke and coal dust that was stored unenclosed and uncovered, at three facilities in Southeast Chicago, has blown onto their properties and polluted the area's air. Defendants—multiple companies involved in one way or another with the three storage facilities—move to dismiss the complaint in its entirety. Defendants' motions are granted in part and denied in part, as discussed below.

## I. Legal Standards

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal marks omitted). To survive a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In deciding a Rule 12(b)(6) motion, courts must construe the complaint in the light most favorable to the plaintiff, accept as true all well-pleaded facts, and draw reasonable inferences in the plaintiff's favor. *Yeftich*, 722 F.3d at 915.

## II. Facts[1]

### A. Background on Petcoke and Coal Dust

Petcoke is a black, powdery byproduct of the crude-oil refining process. CCAC ¶¶ 2, 27, 34–35. It is principally used to generate electricity, to create aluminum and steel, and to make cement. CCAC ¶ 28. Like coal dust, petcoke is lightweight, dust-like, and susceptible to being transported by wind and to being inhaled. CCAC ¶ 29. Petcoke can be harmful if inhaled (CCAC ¶ 2), and can damage property if

---

[1] The facts are taken from the consolidated class action complaint [63], which is cited as "CCAC."

allowed to accumulate (CCAC ¶¶ 5–14). Burning petcoke—for example, to generate electricity—harms the environment and is therefore substantially restricted in the United States. CCAC ¶¶ 30–31. Nonetheless, a substantial market for petcoke exists in other countries. CCAC ¶ 32. In 2012, over 80% of the petcoke produced by refineries in the United States was exported. CCAC ¶ 32. Plaintiffs allege that defendants (either directly or indirectly) profit by selling petcoke. CCAC ¶ 3.

## B. Generation of Petcoke

Defendant BP Products North America, Inc., produces and sells oil and natural gas. CCAC ¶ 18. Petcoke is a byproduct of BP's oil-refinery process. CCAC ¶ 18. When BP expanded its Whiting, Indiana, oil refinery, its permit detailed mandatory precautions regarding the handling, storage, and transfer of petcoke:

> Potential fugitive dust emissions may result from coke handling, storage and transfer operations. The coke handling system will be designed to minimize fugitive dust emission from the coke handling process[…] When the coking process is complete [and following the coke's watering and dewatering][…] it is moved by a bridge crane to a partially enclosed crusher. From the crusher the coke is conveyed in an enclosed conveyor to a transfer tower. The coke is then transferred using a series of enclosed conveyors to either the day bin for loadout into rail cars, or if necessary to the enclosed coke storage pile for temporary storage.

CCAC ¶ 39 (alterations in original). BP stores about five days' production of petcoke at its Whiting refinery. CCAC ¶ 41. Under BP's permit, and a consent decree, the petcoke stored at Whiting is surrounded by 40-foot walls, and an enclosed conveyor and loading system is equipped with wind screens and water sprayers to keep dust down. CCAC ¶ 41.

## C. Transport and Storage of Petcoke

After about five days, petcoke produced at BP's Whiting refinery is transported to the storage facilities at issue in this case. CCAC ¶ 42. The facilities are near densely populated residential neighborhoods in Chicago. CCAC ¶ 43. Defendant Koch Carbon, LLC, owns or controls a substantial amount of petcoke and coal dust that is stored at all three facilities. CCAC ¶ 24.

Defendants George J. Beemsterboer, Inc. and Beemsterboer Slag and Ballast Corporation own or operate the "Beemsterboer Terminal"—a facility located at 2900 E. 106th Street,[2] at which large quantities of petcoke and coal dust have been stored. CCAC ¶¶ 20–21.

Defendant KCBX Terminals Company owns or operates two storage and transfer terminals: the "100th Street Terminal" located at 3259 E. 100th Street, and the "Burley Terminal" located at 10730 S. Burley Avenue. CCAC ¶ 17. At these terminals, KCBX stores large quantities of petcoke and coal dust. CCAC ¶¶ 17, 44.

Defendant KM Railways, LLC ("KMR") owns the property on which the Burley Terminal is located. CCAC ¶ 19. Until December 2012, defendant DTE Chicago Fuels Terminal LLC owned and operated the Burley Terminal and the land on which it is located, and stored uncovered petcoke and coal dust there. CCAC ¶ 22. Defendant Calumet Transload Railroad LLC operates a facility at the Burley Terminal, where large quantities of petcoke and coal dust are stored. CCAC ¶ 23.

---

[2] Although footnote 1 in the consolidated amended complaint refers to 2900 E. 100th Street (instead of 106th Street), that appears to be a typo, as all related allegations in the complaint refer to 106th Street. *See* CCAC ¶¶ 20–21, 43.

Additionally, until February 8, 2007, Calumet Transload owned and operated the Burley Terminal and the land on which it is located. CCAC ¶ 23.[3]

Although covering or enclosing the petcoke and coal dust is possible, the relevant defendants have refused to do so: the dust is stored outside in large, uncovered piles. CCAC ¶¶ 44–45, 57–58.

### D. Harm to Plaintiffs

Plaintiffs own properties near the storage facilities. CCAC ¶¶ 5–14. Plaintiffs allege that "[a]s a direct and foreseeable result" of defendants' conduct, "petcoke and coal dust have been blown throughout surrounding communities, contaminating the air and coating the . . . property within affected areas, reducing the value . . . and interfering with . . . reasonable use and enjoyment of such property." CCAC ¶ 4. Plaintiffs allege that they have been exposed to polluted air and have been forced to spend time, money, and effort cleaning the petcoke and coal dust from their properties. CCAC ¶¶ 5–14, 51–53, 56. They allege decreased values, and reduced use and enjoyment, of their properties. CCAC ¶¶ 5–14, 49–51, 54. They have spent excess money on air conditioning (because doors and windows must be kept shut to keep the dust out). CCAC ¶ 51. Some real and personal property has been ruined by the dust. CCAC ¶ 55. Plaintiffs allegedly live in fear, apprehension, and great distress. CCAC ¶ 16.

---

[3] The complaint does not explain how both KCBX and Calumet Transload can simultaneously operate storage and transfer terminals at the Burley Terminal, but I assume the Burley Terminal contains distinct smaller terminals. The complaint also does not say when KCBX's ownership of the Burley Terminal began relative to DTE's and Calumet Transload's ownership of the same property, but that lack of detail is not dispositive at this stage.

## III.  Analysis

### A. Group Pleading

Count II of the complaint is the only one directed at a single, specific defendant (BP). Counts III, IV, VII, VIII, and IX are directed at all defendants, and Counts I, V, and VI are directed at the "Storage/Distribution Defendants" (all defendants except BP). The complaint begins with allegations common to all counts (CCAC ¶¶ 1–66), and then contains count-specific allegations (CCAC ¶¶ 67–119). Even though all counts except Count II are directed at multiple defendants, the count-specific allegations do not differentiate among the defendants—nothing specific is said about a particular defendant that distinguishes its alleged conduct from that of its co-defendants. All defendants complain that this "group pleading" strategy is insufficient under Rule 8 of the Federal Rules of Civil Procedure.

The common (meaning not count-specific) allegations set forth, in short and plain statements, each defendant's conduct related to petcoke at specific locations. This is adequate to put each defendant on notice as to the claims against it. Specifically:

- The claims against BP concern all three storage facilities. BP is alleged to be a source of petcoke that is stored at all facilities. CCAC ¶¶ 18, 42.

- The claims against Koch Carbon concern all three storage facilities. Koch Carbon allegedly owns or controls petcoke and coal dust stored at all of the facilities. CCAC ¶ 24.

- The claims against KCBX concern only the 100th Street Terminal and the Burley Terminal. KCBX allegedly owns and operates these terminals and stores petcoke and coal dust there. CCAC ¶ 17.

- The claims against KMR concern only the Burley Terminal. KMR allegedly owns the land on which the Burley Terminal is located. CCAC ¶ 19.

- The claims against DTE concern only the Burley Terminal. DTE allegedly owned and operated the Burley Terminal and the land on which it is located, and stored petcoke there, until December 2012. CCAC ¶¶ 19, 22.

- The claims against Calumet Transload concern only the Burley Terminal. Calumet Transload allegedly owned and operated the Burley Terminal and the land on which it is located, until February 8, 2007. CCAC ¶ 23. Also, Calumet Transload allegedly operates a facility at that location that stores petcoke and coal dust. CCAC ¶ 23.

- The claims against George J. Beemsterboer and Beemsterboer Slag and Ballast concern only the Beemsterboer Terminal, which these defendants allegedly own and operate, at which petcoke and coal dust are allegedly stored. CCAC ¶¶ 20–21.

Thus, while I agree that "group pleading" could theoretically be so vague that a particular defendant would not know the nature of the claims against it, that is not the case here. Plaintiffs have connected each defendant to specific petcoke storage locations, and plaintiffs complain about specific conduct of each defendant (*e.g.*, creation of petcoke, ownership of petcoke, storage of petcoke, ownership of a storage facility, or ownership of land on which petcoke is stored by others). Each defendant has "sufficient notice to begin to investigate and defend against [the] claim." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008).[4] The notice-pleading requirements of Rule 8 are therefore met. Whether the alleged conduct states a claim, and thus survives a Rule 12(b)(6) motion, is a separate question.

---

[4] The Seventh Circuit has stated that greater factual detail may be required at the pleadings stage in complex cases or cases in which discovery is likely to be particularly expensive. *Tamayo*, 526 F.3d at 1083. But the allegations in this case are readily understood to be about a specific product (petcoke) stored at specific locations, so greater factual detail is not required "to show that the plaintiff has a plausible claim." *Id.*

DTE makes a separate argument why group pleading is particularly inappropriate in its case. Plaintiffs appear to concede that DTE has not owned or operated any of the storage facilities since December 2012. CCAC ¶¶ 19, 22. But, DTE argues, plaintiffs have only alleged harm from late 2013 onward. *See* [80] at 4, 5, 6, 11; [98] at 2, 3. In DTE's view, there is no temporal overlap between its involvement with a storage facility and plaintiffs' alleged harm; thus, DTE believes it is entitled to more specific allegations or to have the claims against it dismissed. But as plaintiffs make clear in their response (which is not inconsistent with the complaint), they "have suffered damages from the migration of petcoke and coal dust from the Storage Facilities on a near daily basis throughout the duration of the Class period." [91] at 18.[5] Thus, the allegations against DTE are similar in nature to those against the other Storage/Distribution Defendants.

**B. Counts Based on Negligent Conduct**

   1.   Count VI: Negligence (Against Storage/Distribution
        Defendants)

Count VI is a negligence count against the Storage/Distribution Defendants. Plaintiffs allege that these defendants had a duty to own and operate their terminals, and store, distribute, and sell petcoke and coal dust, "in such a way that petcoke and coal dust would not migrate onto" plaintiffs' property. CCAC ¶ 102. Plaintiffs allege that these defendants breached that duty (for example, by not

---

[5] The class period is October 31, 2008 to the present. CCAC ¶ 59. The complaint contains specific allegations about Illinois governmental actions after 2012, *see* CCAC ¶¶ 46, 48, but those allegations are not a concession that no harm occurred to plaintiffs before 2012. The complaint fairly encompasses the time period of 2008 to the present.

covering the dust piles). CCAC ¶ 103. Plaintiffs allege that, as a result of the breach, they have been injured in that (1) their property values dropped, and (2) they have used and enjoyed their properties less. CCAC ¶ 105.

A negligence action under Illinois law requires duty, breach, causation, and harm. *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 441 (7th Cir. 2009) (citing *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill.2d 107 (Ill. 1995)). The existence of a duty is a matter for the court to decide. *Adams v. N. Ill. Gas Co.*, 211 Ill.2d 32, 43–44 (2004). "The touchstone of [the] duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Co.*, 222 Ill.2d 422, 436 (2006). "The question turns largely on public policy considerations, informed by consideration of four traditional factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 391 (2004).

Plaintiffs' only allegation concerning defendant KMR is that it "owns the property on which KCBX's Burley Terminal is situated, as well as rail tracks and rail facilities on and adjacent thereto." CCAC ¶ 19. Plaintiffs' theory is that it is negligent to store petcoke unenclosed and uncovered at facilities that are near to residential neighborhoods. That theory does not directly implicate KMR, which is not alleged to control the manner of storage. And under Illinois law, a landlord is

not generally liable to third parties for the negligent activities of the landlord's tenants. *See Sedlacek v. Belmonte Props.*, 384 Ill. Dec. 485, 489 (2d Dist. 2014); *Klitzka v. Hellios*, 348 Ill.App.3d 594, 597 (2004); *Conway v. Epstein*, 49 Ill.App.2d 290, 294–95 (1964). Therefore plaintiffs have not stated a claim for negligence against KMR.

As to the other Storage/Distribution Defendants, plaintiffs have pleaded enough: they allege that these defendants owned or operated storage facilities near residential neighborhoods. Given the geographical proximity, the foreseeability that a dust-like particle would be transported by wind, the known dangers of inhaling these dust particles or allowing them to accumulate, and the difficulty the home-owners would have in protecting themselves and their property, plaintiffs have sufficiently alleged that these defendants owed a duty to exercise reasonable care toward the plaintiffs. *See Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 86 (1964) ("It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons."). Plaintiffs sufficiently allege a breach of that duty—by failing to sufficiently spray, enclose, or cover the dust-like particles. Plaintiffs also sufficiently allege that the breach foreseeably caused the plaintiffs' harm, by covering their properties in dust and forcing them to stay indoors.

Furthermore, the defendant-specific allegations, in combination with the common allegations, put each defendant sufficiently on notice as to its alleged negligence. Specifically, if a defendant stored petcoke without taking reasonable care, a claim of negligence is sufficiently alleged. Defendants KCBX and DTE are alleged to have done so.[6] CCAC ¶¶ 17, 22. If a defendant controlled a storage facility and failed to ensure that petcoke stored there was stored appropriately, a claim of negligence is sufficiently alleged.[7] Defendants KCBX, George J. Beemsterboer, Beemsterboer Slag and Ballast, DTE, and Calumet Transload are alleged to have done so.[8] CCAC ¶¶ 17, 20–23. And if a defendant owned petcoke and failed to ensure that it was stored in a reasonable manner, a claim of negligence is sufficiently alleged.[9] Defendant Koch Carbon is alleged to have done so. CCAC ¶ 24.

Plaintiffs have therefore sufficiently pleaded a negligence action against KCBX, George J. Beemsterboer, Beemsterboer Slag and Ballast, DTE, Calumet Transload, and Koch Carbon. Plaintiffs have not sufficiently pleaded a negligence action against KMR.

---

[6] KCBX at the 100th Street Terminal and the Burley Terminal, DTE at the Burley Terminal only. CCAC ¶¶ 17, 22.

[7] A reasonable inference is that a party that owns or controls a storage terminal has some authority to direct that petcoke stored there be enclosed, covered, or sprayed. Some factual development may demonstrate otherwise, but at this stage the allegations suffice.

[8] KCBX is alleged to have controlled the 100th Street Terminal and Burley Terminals. CCAC ¶ 17. George J. Beemsterboer, Inc. and Beemsterboer Slag and Ballast Corporation are alleged to have controlled the Beemsterboer Terminal. CCAC ¶¶ 20–21. DTE and Calumet Transload are alleged to have controlled the Burley Terminal. CCAC ¶¶ 19, 22–23.

[9] A reasonable inference is that the owner of petcoke could choose where to store it and would have had some authority to direct that it be enclosed, covered, or sprayed. Some factual development may demonstrate otherwise, but at this stage the allegations suffice.

### 2. Count I: Private Nuisance (Against Storage/Distribution Defendants)

To state a claim for private nuisance, a plaintiff must allege: (1) a substantial invasion of the use and enjoyment of land; and (2) that such invasion was either negligent or intentional and unreasonable. *In re Chicago Flood Litig.*, 176 Ill.2d 179, 204 (1997); *see also id.* at 205–06 ("Typical examples [of a private nuisance] would be smoke, fumes, dust, vibration, or noise produced by defendant on his own land and impairing the use and enjoyment of neighboring land."). Plaintiffs have alleged a substantial invasion of the use and enjoyment of their land. CCAC ¶¶ 5–14, 71.

As discussed above, plaintiffs have not adequately pleaded negligence as to defendant KMR; accordingly, plaintiffs have not stated a private nuisance claim against KMR either. As to the other Storage/Distribution Defendants, as discussed above, plaintiffs have adequately pleaded negligence and that these defendants had some responsibility for the petcoke not being enclosed, covered, or sprayed, which is the condition that led to the substantial invasion of the use and enjoyment of plaintiffs' properties. Private nuisance has therefore been adequately pleaded as to these defendants. Count I is dismissed as to KMR, but not as to KCBX, George J. Beemsterboer, Beemsterboer Slag and Ballast, DTE, Calumet Transload, and Koch Carbon.

### 3. Count V: Trespass (Against Storage/Distribution Defendants)

Under Illinois law, a claim for trespass requires negligent or intentional conduct by the defendant resulting in an intrusion on the plaintiff's land. *Porter v.*

*Urbana-Champaign Sanitary Dist.*, 237 Ill.App.3d 296, 303 (4th Dist. 1992) (citing *Dial v. City of O'Fallon*, 81 Ill.2d 548, 558 (1980)); *see also Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, 282 Ill.App.3d 129, 139 (2d Dist. 1996) ("A trespass is an invasion in the exclusive possession and physical condition of land."). Plaintiffs have adequately pleaded an intrusion on their interest in exclusive possession of their land. CCAC ¶¶ 5–14, 96.

As discussed above, plaintiffs have not adequately pleaded negligence as to defendant KMR; accordingly, plaintiffs have not stated a trespass claim against KMR either. As to the other Storage/Distribution Defendants, as discussed above, plaintiffs have adequately pleaded negligence and that these defendants had some responsibility for the petcoke not being enclosed, covered, or sprayed, which is the condition that led to the intrusion on plaintiffs' land. Trespass has therefore been adequately pleaded as to these defendants. Count V is dismissed as to KMR, but not as to KCBX, George J. Beemsterboer, Beemsterboer Slag and Ballast, DTE, Calumet Transload, and Koch Carbon.

### 4. Count VII: Willful and Wanton Conduct (Against All Defendants)

Count VII alleges that all defendants had a duty "not to consciously and deliberately disregard the known danger" in "marketing, distributing and storing petcoke from BP's Whiting refinery." CCAC ¶ 107. Plaintiffs allege that defendants breached this duty by distributing, storing, and selling petcoke "in conscious and deliberate disregard of petcoke's known danger to Plaintiffs and Class members and their property." CCAC ¶ 108.

In Illinois, "willful and wanton conduct" is an aggravated form of negligence, not a separate tort. *Krywin v. Chicago Transit Authority*, 238 Ill.2d 215, 235 (2010). Thus, Count VII fails (and is dismissed) as to KMR for the same reasons as Count VI. And as it concerns the other Storage/Distribution Defendants, Count VII is duplicative of Count VI. Allegations of willful and wanton conduct may become relevant at a later stage (for example, to decide an appropriate remedy), but they do not state an independent claim. Thus, to the extent it purports to state a separate cause of action, Count VII is dismissed as to KCBX, George J. Beemsterboer, Beemsterboer Slag and Ballast, DTE, Calumet Transload, and Koch Carbon.

Count VII is not duplicative as to BP, because BP was not named in the count for ordinary negligence (Count VI). As discussed above, plaintiffs must plead duty, breach, causation, and harm; the existence of a duty is a matter for the court to decide by examining the relationship between plaintiff and defendant, and considering the foreseeability and likelihood of injury, the burden of guarding against the injury, and the consequences of placing that burden on the defendant.

Plaintiffs' allegations focus on the unenclosed and uncovered storage and distribution of petcoke, but plaintiffs do not allege that BP stores or distributes petcoke. Plaintiffs offer no factual allegations that support their conclusion in paragraph 75 of the complaint that BP "actively participated in" transporting, handling, and storing petcoke in an unreasonable manner. These conclusions are the type of naked assertions devoid of further factual enhancement that the Supreme Court has held cannot defeat a motion to dismiss. *See Iqbal*, 556 U.S. at

678. Indeed, plaintiffs undermine their own conclusions by alleging that all defendants *other than* BP own and operate the storage facilities. CCAC ¶¶ 17–24. Plaintiffs have therefore insufficiently alleged the existence of a duty, because BP's non-participation in the storage of petcoke reduces the foreseeability and likelihood of injury arising out of its conduct, and draws into question whether the burden of guarding against injury should be placed on BP. *See Traube v. Freund*, 333 Ill.App.3d 198, 202 (5th Dist. 2002) ("[T]he absence of a manufacturer's control over a product at the time the nuisance is created generally is fatal to any nuisance or negligence claim"). Further, plaintiffs have insufficiently alleged the element of causation as to BP. *See Beretta*, 213 Ill.2d at 405–06 ("If a defendant's breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury."); *id*. at 410 (noting that both the existence of a duty and the finding of proximate cause "depend on an analysis of foreseeability"). Count VII is therefore dismissed as to BP.

### 5.  Count II: Private Nuisance (Against BP)

Count II asserts that BP is liable for private nuisance. CCAC ¶¶ 76–77, 79. To state this claim, plaintiffs must allege that an invasion of their land resulted from BP's conduct that was negligent (or more culpable than that). *Chicago Flood Litig.*, 176 Ill.2d at 204; *Traube*, 333 Ill.App.3d at 201–02 ("In order to sustain a nuisance claim based on negligent conduct, a plaintiff must plead and prove the elements of negligence that gave rise to the alleged nuisance."). As discussed above,

plaintiffs have not adequately pleaded BP's negligence. The nuisance claim against BP is therefore dismissed.

### C. Strict Liability Counts

"Illinois recognizes strict liability under two theories: unreasonably dangerous defective products and ultrahazardous activities." *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1202 (7th Cir. 1984); *Fallon v. Indian Trail School*, 148 Ill.App.3d 931, 933 (2d Dist. 1986). Count IV sets forth a defective product theory, while Count III sets forth a theory based on ultrahazardous activity (or "abnormally dangerous activity").

#### 1.   Count IV: Strict Liability in Tort (Against All Defendants)

Count IV asserts that defendants "manufactured, sold, distributed, and marketed" petcoke "under circumstances and in a condition that was unreasonably dangerous" in that petcoke is a "hazardous material which becomes airborne when transported and stored without being enclosed . . . ." CCAC ¶ 91. Count IV is based on the defective product theory of strict liability. [91] at 26 ("The CAC Pleads All of the Elements for Strict Liability Based on Product Defect").

"Under Illinois law, the elements of a claim of strict liability based on a defect in the product are: (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition." *Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 543 (2008). "A product may be found to be unreasonably dangerous based on proof of any one of three conditions: a physical defect in the product itself,

16

a defect in the product's design, or a failure of the manufacturer to warn of the danger or to instruct on the proper use of the product." *Id*. at 525. "A nondefective product that presents a danger that the average consumer would recognize does not give rise to strict liability." *Martin*, 743 F.2d at 1202; *see also Beretta*, 213 Ill.2d at 380 ("a products liability claim against one who lawfully manufactures and sells a nondefective product must fail").

Plaintiffs are not consumers of petcoke; their theory is that they are innocent bystanders. [91] at 31–32. But plaintiffs do not identify any purported *defect* in petcoke, of which petcoke's consumers are unaware. *See DeLuca v. Liggett & Myers, Inc.*, 2003 U.S. Dist. LEXIS 5938, *21 (N.D. Ill. 2003) ("plaintiff must identify a particular defect that exposed Joseph to an unreasonable risk of harm"). Plaintiffs' argument is that the characteristic of petcoke that makes it dangerous is its dust-like nature, which makes it susceptible to being blown by wind. Plaintiffs have not adequately explained why that is a defect, nor have they raised a plausible inference that petcoke's consumers are unaware of its dust-like quality. Plaintiffs therefore do not state a claim for strict liability under a defective product theory, and Count IV is dismissed.[10]

### 2. Count III: Abnormally Dangerous Activity (Against All Defendants)

Count III asserts that defendants are strictly liable for engaging in an "abnormally dangerous activity." Whether an activity is abnormally dangerous is a

---

[10] As it concerns KMR, the count must be dismissed for the additional reason that plaintiffs have not adequately alleged that KMR is even indirectly in the business of selling petcoke.

matter of law. *Ind. H. B. R.R. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1176 (7th Cir. 1990). Where an activity can be made safer by the exercise of due care, it is not abnormally dangerous. *Id.* at 1177–79.

Plaintiffs define the "activity" as the "uncovered distribution and storage of petcoke in an area that is regularly subject to moderate to high winds and in close proximity to densely-populated neighborhoods." CCAC ¶ 83. Plaintiffs allege that "[i]t is extremely difficult, if not impossible, to eliminate the risk of harm posed by storing uncovered piles of petcoke in an area regularly subject to moderate and high winds and in close proximity to densely-populated neighborhoods." CCAC ¶ 86.

By including the fact that storage occurs outside and uncovered, plaintiffs have tried to narrowly define the activity, to avoid the rule that where an activity can be made safer by the exercise of care, it is not abnormally dangerous. Indeed, plaintiffs recognize that whether petcoke is covered or uncovered is an important distinction. [91] at 23 ("Of course, the uncovered storage of [petcoke] is fundamentally different from the covered storage of petcoke."). But allowing the activity to be narrowly defined to specifically exclude the exercise of care would turn every negligence action into a strict liability one, which is counter to the teaching of *Indiana Harbor*, 916 F.2d at 1177–79.

Defendants are alleged to be directly or indirectly in the business of selling petcoke, and storing and distributing it is part of that business; but that the storage takes place outdoors and uncovered is not alleged to be central to the selling business. *See Cusumano v. Mapco Gas Prods.*, 1994 U.S. Dist. LEXIS 1502, at *3

(N.D. Ill. 1994) (rejecting definition of activity designed to inevitably lead to dangerous situations, and noting that the defendant "is not in the business of releasing LP gas into enclosed spaces; it is in the business of selling LP gas."). Plaintiffs have not alleged that petcoke can never be stored safely—to the contrary, they allege that enclosing, covering, or spraying petcoke with water would reduce the likelihood of harm. *E.g.*, CCAC ¶¶ 57–58. Because the core activity can be made safer by the exercise of care, plaintiffs have not stated a claim for strict liability on a theory of abnormally dangerous activity, so Count III is dismissed.[11]

### D. Count VIII: Civil Conspiracy (Against All Defendants)

Count VIII asserts that all defendants engaged in a civil conspiracy. "In order to state a claim for civil conspiracy, a plaintiff must plead a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Buckner v. Atl. Plan Maint., Inc.*, 182 Ill.2d 12, 23 (1998). "The agreement is a necessary and important element of this cause of action." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999) (internal marks omitted). Where an agreement is not overt, "the alleged acts must be sufficient to raise the inference of mutual understanding (i.e., the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal marks omitted). Detailed allegations of parallel

---

[11] As it concerns BP and KMR, the count must be dismissed for the additional reason that plaintiffs have not alleged that either BP or KMR is engaged in the activity of storing or distributing petcoke at the relevant facilities.

conduct, with only bare assertions of an agreement, do not suffice. *Twombly*, 550 U.S. at 548–56.

Plaintiffs allege that defendants entered into an agreement to sell, transport, and distribute petcoke "in a manner that would result in petcoke migrating from the Storage Facilities into surrounding communities and contaminating the properties within such communities." CCAC ¶ 111. Plaintiffs further allege that each of the defendants "agreed that the purpose of the scheme was to sell and distribute petcoke through storing and distributing petcoke at the Storage Facilities in close proximity to densely-populated residential communities." CCAC ¶ 112. Plaintiffs further allege that defendants "participated in a scheme to commit and did, in fact commit unlawful acts in furtherance of their agreement." CCAC ¶ 113.[12]

The allegations of an agreement are barebones: plaintiffs say nothing about when the agreement took place, what form it was in, or which defendants participated (though presumably plaintiffs would allege all defendants participated, since the count is asserted against all defendants). Nothing in the complaint connects unrelated defendants to each other—there are no allegations, for example, connecting Beemsterboer Slag and Ballast Corporation to KMR, or to DTE. Also, different defendants relate to different time periods—for example, DTE's relevant conduct ends in 2012, which is the beginning of the period relevant to KMR. CCAC ¶¶ 19, 22. The non-overlapping time periods make the barebones allegations of a multilateral agreement particularly insufficient.

---

[12] The alleged unlawful acts are those set forth in Counts I through V, and VII. CCAC ¶ 113.

In *Twombly*, the Supreme Court indicated that to make conspiracy allegations plausible, a plaintiff should suggest a reason that the agreement was formed. *See* 550 U.S. at 566 (noting the complaint "fails to answer the point that there was just no need for joint encouragement" to engage in the parallel conduct). Plaintiffs have suggested no such reason. If the alleged agreement was simply to sell petcoke, plaintiffs do not suggest why a multilateral agreement would have been necessary—they allege that petcoke is valuable (CCAC ¶ 32), which presumably is reason enough for each defendant, without an agreement, to sell it. If, on the other hand, the alleged agreement was to store petcoke unenclosed and uncovered in a residential neighborhood, plaintiffs have not suggested why the defendants would want that. A reason is necessary, since the alleged agreement would be to purposefully allow the wind to carry off a profitable product.

Plaintiffs' use of the words "agreement" and "scheme" are bare conclusions that do not carry the complaint across the plausibility line—those words were also present in the *Twombly* complaint. *Id*. at 564 ("Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations."). A claim of conspiracy will be dismissed when it is "bereft of any suggestion, beyond a bare conclusion, that the [] defendants were leagued in a conspiracy . . . ." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009).

Because plaintiffs do not allege sufficient support for a reasonable inference that defendants entered into the agreement referenced in the complaint, Count VIII is dismissed.

### E.  Count IX: Declaratory Relief (Against All Defendants)

Count IX seeks "a declaration (a) stating Defendants have caused the discharge of petcoke and coal dust onto Plaintiffs' and the other Class members' property, (b) stating that Defendants had and have knowledge that petcoke is abnormally dangerous, (c) stating Defendants are liable under each of the above-referenced causes of action by virtue of the complained-of-conduct, (d) requiring Defendants to take all necessary measures to prevent the discharge of petcoke and coal dust in the future, including prohibiting BP from distributing petcoke into the subject densely-populated residential community, (e) requiring Defendants to remedy all past and future petcoke and coal dust discharge, (f) stating that Defendants are liable for all appropriate damages, including punitive damages, under said causes of action, and (g) stating that Defendants are liable for all appropriate attorneys' fees and costs under said causes of action." CCAC ¶ 119.

Defendants argue that this count is duplicative of Counts I through VIII and that courts in this district routinely dismiss duplicative declaratory relief claims, for judicial economy. In response, plaintiffs cite *Pella Corp. v. Saltzman*, 606 F.3d 391, 395 (7th Cir. 2010). In *Pella*, the plaintiffs sued defendants for selling defective windows. The Seventh Circuit affirmed the district court's certification of two sub-classes of window-owners—one in which the class members had not yet suffered any damage from the defect, and one in which they had. The Seventh Circuit found that

class members who had not yet been damaged would benefit from declarations that they were covered by the relevant warranty, that the windows contained an inherent defect, and specifying the appropriate remedy once damage was sustained. *Id*. at 395. Plaintiffs here say that their count for declaratory relief is not duplicative, under the logic of *Pella*, because some class members may not yet have suffered damage. [91] at 39.

Plaintiffs' argument is insufficient as to BP and KMR, because all of the substantive counts against these defendants have been dismissed. Plaintiffs' argument is also insufficient as to DTE, because DTE no longer owns or operates any of the relevant storage facilities, so remedies against it are backward-looking only. Further, the logic of *Pella* does not apply because the specific declarations that plaintiffs seek are not directed toward the future. For example, plaintiffs seek a declaration that "Defendants have caused the discharge of petcoke and coal dust onto Plaintiffs' and the other Class members' property." If that is true, the relevant class members' substantive counts would be ripe; thus, the declaration is backward-looking and duplicative of the substantive counts. The same is true of the declarations sought in CCAC ¶¶ 119(b) and (c). And the declarations sought under CCAC ¶¶ 119(d), (e), (f), and (g) concern the remedies available if defendants are found liable under a substantive count, and are therefore duplicative of the complaint's common prayers for relief. Accordingly, Count IX is dismissed.

## IV.    Conclusion

For the reasons discussed above:

- Beemsterboer Slag and Ballast, George J. Beemsterboer, and Calumet Transload's motion to dismiss [73] is granted in part (Counts III, IV, VII, VIII, and IX are dismissed) and denied in part (Counts I, V, and VI are not dismissed).

- KCBX, Koch Carbon, and KMR's motion to dismiss [76] is granted in part and denied in part. All claims against KMR are dismissed, and KMR is dismissed from the case and terminated as a party. As to KCBX and Koch Carbon: Counts III, IV, VII, VIII, and IX are dismissed, but Counts I, V, and VI are not dismissed.

- DTE's motion to dismiss [79] is granted in part (Counts III, IV, VII, VIII, and IX are dismissed) and denied in part (Counts I, V, and VI are not dismissed).

- BP's motion to dismiss [82] is granted. BP is dismissed from the case and terminated as a party.


ENTER:

Manish S. Shah
United States District Judge

Date:  11/12/14